NEW HAMPSHIRE AUTOMOBILE DEALERS ASSOCIATION, INC.; New Hampshire Auto, Inc.; Merrimack Street Garage, Inc.; Dreher Holloway Buick-Pontiac, Inc.; Tulley Buick-Pontiac Company, Inc.; Banks Chevrolet-Cadillac, Inc.; Coast Pontiac-Cadillac, Inc.; McGreevy Buick-Cadillac, Inc.; Taccetta Chevrolet, Inc.; Bournival, Inc.; Garfield Oldsmobile-Cadillac, Inc.; Fairfield Motors, Inc.; Woodward's Sales and Service, Inc.

v.

GENERAL MOTORS CORPORATION.

Civil No. 84–336–D.

United States District Court,
D. New Hampshire.

Oct. 17, 1985.

McLane, Graf, Raulerson & Middleton by James R. Muirhead, Wiggin & Nourie by Sterling Schoen, Manchester, N.H., for plaintiffs.

Myers & Laufer by Howard B. Myers, Concord, N.H., for defendant.

## MEMORANDUM OPINION

DEVINE, Chief Judge.

This litigation challenges the differing methods by which motor vehicles are marketed. Specifically, the case focuses on the manner in which such vehicles are allocated for sales as between retail and "fleet" purchasers.[1] The claims advanced are that such allocations are violative of certain statutes enacted by the New Hampshire Legislature.[2]

At this stage of the proceedings, the Court addresses the issues raised by a motion for summary judgment filed by the defendant, General Motors Corporation ("GM"). The plaintiffs are the New Hampshire Automobile Dealers Association, Inc. ("NHADA"), a nonprofit corporation, and twelve franchised GM dealers whose places of business are in New Hampshire.[3]

An order of summary judgment is appropriate only when the pleadings and other

1. For the purposes of this case, "fleet" purchasers may be defined as any company or nonfederal political subdivision of government which has purchased and registered or leased ten or more new cars and/or trucks solely for use in its own operations during the current or preceding calendar or model year or the preceding twelve-month period. Examples of fleet purchasers may be found in rental car companies, taxi cab companies, and police departments.

2. These statutes are "Regulation of Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers", Revised Statutes Annotated ("RSA") Chapter 357–C; and "Regulation of Business Practices for Consumer Protection", RSA Chapter 358–A.

3. All of the plaintiffs are New Hampshire residents, and GM is a Delaware corporation with its principal place of business in Detroit, Michigan. The instant action was commenced in a New Hampshire state court and was here removed by GM pursuant to the provisions of 28 U.S.C. §§ 1441 and 1446.

submissions show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P.; *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 411 (1st Cir.1985). The manner in which the record must be reviewed requires that all inferences be drawn in the light most favorable to the party opposing the motion. *Metropolitan Life Insurance Company v. Ditmore*, 729 F.2d 1, 4 (1st Cir.1984). But the mere fact that issues are complex and that they involve state of mind, intent, or motivation does not automatically preclude summary judgment. *Stepanischen v. Merchants Despatch Transportation Corporation*, 722 F.2d 922, 929 (1st Cir.1983). Moreover, a "court is not obliged to find that a genuine issue of material fact exists where the only evidence of such an issue is a series of conclusory statements unsupported by specific factual allegations." *Velazquez v. Chardon*, 736 F.2d 831, 833–34 (1st Cir.1984) (citation omitted).

### 1. The Factual Background

The varied divisions of GM (such as Oldsmobile, Pontiac, Buick, Chevrolet) annually decide what proportion of vehicle production is to be allocated between retail and fleet sales. P Res, App 4, pp. 63, 103–05;[4] GM Ex A, p. 20.[5] Historically, not over 27.2 percent of national production is allocated to fleet sales, the balance being allocated to sales at retail. P Res, App 2, pp. 67–68; GM Ex A, pp. 19, 20, 22.

Divisional retail allocations are apportioned among geographic areas, or "Zones", which are based on prior sales records of dealers situate in each such Zone. GM Ex A, p. 20. Fleet allocations are subdivided between local and national sales, and local allocations are apportioned to Zones based on prior sales records. *Id.*

National fleet allocations are set aside for dealer orders for large fleets (such as Hertz, Avis, and National rental car companies) that operate nationally, and the allocation is therefore not apportioned to any Zone. *Id.*

Whether marketed retail or fleet, all new GM vehicles are sold only through franchised GM dealers. GM Ex B, p. 2. Each such dealer enters into a written "Dealer Sales and Service Agreement", which grants to the dealer the sole right of the use of GM trademarks, trade names, and related identification. *Id.*

GM dealers submit their orders for new vehicles to geographically dispersed GM factories, none of which are located in New Hampshire. GM Ex B, p. 3. Orders are accepted by GM when scheduled for production, and the vehicles are delivered to the dealers when assembled. *Id.* The dealers then pay GM, and in turn resell the vehicles to their retail or fleet customers. *Id.*

GM dealers compete with the dealers of other manufacturers (such as Ford or Chrysler), not only for retail, but also for fleet sales. GM Ex A, pp. 5, 6. GM accordingly provides sales incentives to its dealers for each of said types of sales. GM Ex B, pp. 3, 4.

Commencing in 1981, GM offered certain fleet sale incentives, which were available to any dealer who desired to compete for such sales. GM Ex A, pp. 5–7. Such packages of incentives might include items in the nature of free air conditioners or radios or price protection for a certain period of time. *Id.* These incentives would be developed through the medium of contacts between GM's fleet representatives and the representatives of large fleet purchasers. *Id.*; P Res App 1, pp. 71–73, 76–80; App 29. When approved by GM's executive

---

**4.** The term "P Res" has reference to "Plaintiffs' Response to Defendant's Motion for Summary Judgment" and "Plaintiffs' Supplemental Response" to such motion. In each such document, the appendices are numbered sequentially, and the term "App" bears reference to such numbered appendix and is followed by the pag-

ination (where available) with reference to the contents of such appendix.

**5.** The term "GM Ex" refers to "Appendix to Brief of General Motors Corporation", exhibits in which are designated by sequential use of the alphabet.

committee, the incentive package for a given model unit would be made available to all GM dealers who were interested in competing in the market for the sales of such units. *Id.;* GM Ex B, pp. 4, 5.

The national car rental companies purchase vehicles in large volume through a small network of dealers who actively compete for such sales. GM Ex B, p. 5. Such "fleet oriented" dealers compete with one another as well as with the dealers of other manufacturers. *Id.* at 5, 6.

Certain of the fleet sales incentive programs were designed to meet production needs of either GM or the fleet operators. P Res, App 1, p. 133. A specific example occurred in June 1983 when GM discovered it had insufficient dealer orders for the base (or less expensive) models of its Chevrolet Camaro and Pontiac Firebird. P Res, App 1, pp. 94–96; App 24, pp. 700389–700391; GM Ex A, pp. 4, 5. Accordingly, free air conditioning was offered on any such vehicle sold for immediate delivery on condition that a minimum of one thousand vehicles were sold to a fleet operator within a set calendar period of time. *Id.* This program was available to any GM dealer who was interested in such a large volume sale. GM Ex A, p. 5.

Prior to the spring of 1984, GM dealers who purchased vehicles for their own rental or leasing fleets were required to maintain on file a valid lease agreement for a minimum term of six months and to maintain rental vehicles in use for four months or a minimum of one thousand miles. P Res, App 1, pp. 124–25; GM Ex A, p. 14, n. 6. By contrast, fleets not operated by dealers were merely required to retain vehicles in their possession for a minimum of three months. *Id.* The rationale for the stricter requirements imposed upon GM dealers was the perception of GM that such requirements were necessary to prevent its dealers from moving vehicles back and forth between their retail and fleet inventories. *Id.;* P Res, App 1, pp. 124–25; App 4, pp. 76–77.

The genesis of this litigation is the complaint of the plaintiffs of competition aris-ing from the action of Merchants Rent-A-Car ("Merchants"), a New Hampshire corporation headquartered in Hooksett, New Hampshire. At times relevant to this litigation, Merchants was one of the larger licensees of the National Rent-A-Car System ("National") and operated substantial lease and rental fleets. P Res, App 25. The majority of the GM vehicles procured by Merchants were the result of its transactions with GM dealers located in states other than New Hampshire. P Res, App 2, pp. 122–27; App 4, pp. F16, G4, N9, 012, L11, J16, C15, B2, App 14; App 15; App 22; App 25.

In 1983, GM received complaints that Merchants was abusing its fleet privileges in that it was selling new fleet vehicles at retail. P Res, App 1, pp. 167–69; App 2, pp. 45–49. When its investigation verified these complaints, GM canceled the fleet privileges of Merchants, together with its right to receive drop shipments of GM vehicles and to provide warranty service to vehicles designed for use in its own fleet. P Res, App 1, p. 148; App 2, pp. 45–47; App 3, pp. 15–19; App 4, pp. 16–20; GM App H, pp. 15–20; App M; App Q.

In 1984, after a year of preliminary discussions, GM instituted a new "fleet abuse" program. P Res, App 1, pp. 45–53; GM Ex N. All fleet users were required to execute an "Enrollment Form for Fleet Users", GM Exs I, K, and all fleet users, whether dealer controlled or otherwise, were required to hold fleet vehicles for a minimum period of six months. *Id.* Violations of fleet guidelines would result in a "charge back" to the selling dealer in an amount equal to the cost of any fleet incentive and might also result in disqualification from further participation in fleet programs. *Id.*

## 2. The Allegations of Discriminatory Pricing

The plaintiffs herein claim that the various fleet incentives provided by GM resulted in a two-tier pricing system which dis-

criminates against GM dealers.[6] They argue that a nonfranchised dealer[7] associated with a large fleet purchaser (as is here the case with the connection between Merchants and National) is able to procure vehicles[8] for its fleet at a lower actual price than is available to the GM dealer.[9] Plaintiffs contend that the existence of fleet incentives, taken together with GM's failure to police abuses of its fleet guidelines, are violative of the provisions of RSA 357–C:3 III(e) and (f). Complaint ¶¶ 28–31.

The Court here notes that in enacting RSA 357–C the New Hampshire Legislature clearly acknowledged the distinction between retail sales and those intended for fleet use. The existence of such knowledge is initially to be found in the (hereinafter emphasized) language of a provision of the statute which plaintiffs here claim to be violated. That provision of the statute makes it an unfair method of competition and unfair and deceptive practice for any manufacturer in the position of GM to

> [o]ffer to sell or to sell any new motor vehicle at a lower actual price than the actual price offered to any other motor vehicle dealer for the same model vehicle similarly equipped or utilize any device including, but not limited to, sales promotion plans or programs which result in

a lesser actual price. *However, the provisions of this subparagraph shall not apply to sales to a motor vehicle dealer for resale to any unit of government; to sales made directly to a unit of government; nor to sales to a motor vehicle dealer of any motor vehicle ultimately sold, donated or used by such dealer in a driver education program.* The provisions of this subparagraph shall not apply so long as a manufacturer, distributor, or any agent thereof, offers to sell or sells new motor vehicles to all motor vehicle dealers at an equal price.

RSA 357–C:3 III(e) (emphasis added).

Another example of the legislative recognition of the existence of fleet incentives is to be found in RSA 357–C:11, which provides:

> In connection with a sale of any motor vehicle to the state or to any political subdivision thereof, no manufacturer or distributor shall offer any discounts, refunds or other similar inducement to any dealer without making the same offer to all other dealers of the same line make within the relevant market area.

Plaintiffs attempt to interpret the terms "offer to sell or to sell" in RSA 357–C:3 III(e) and "offer, sell or lease" in RSA

---

**6.** As previously indicated, p. 1153, *supra,* certain of the GM dealers maintain their own rental or leasing fleets of varying sizes. It is necessary, however, to distinguish between such fleet operations, as the provisions of RSA 357–C have reference to the plaintiffs only in their capacity as dealers, and not as fleet operators. The blurring of this distinction is explanatory of the reason why GM originally set different requirements for the holding of fleet vehicles as between fleets maintained by its dealers and those maintained by nonfranchised dealers. *See* p. 1153, *supra.*

**7.** With certain exceptions not here applicable, RSA 357–C defines the term "motor vehicle dealer" to mean

> any person engaged in the business of selling, offering to sell, soliciting or advertising the sale of new or used motor vehicles or possessing motor vehicles for the purpose of resale either on his own account or on behalf of another, either as his primary business or incidental thereto.

RSA 357–C:1 VIII(a).

**8.** This case concerns itself only with new motor vehicles, defined by the statute to mean

> a vehicle which is in the possession of the manufacturer or distributor, or has been sold only to the holders of a valid sales and service agreement, franchise or contract granted by the manufacturer or distributor for the sale of that make of new motor vehicle and which is in fact new and on which the original title has not been issued from the franchised dealer.

RSA 357–C:1 XV.

**9.** Franchised GM dealers fall within the statutory definition of the term "new motor vehicle dealer", which means

> a motor vehicle dealer who holds a valid sales and service agreement, franchise or contract granted by the manufacturer or distributor for the sale of its new motor vehicles.

RSA 357–C:1 VIII(b).

357–C:3 III(f)[10] as imposing on GM the requirement to directly notify each of its 11,000 franchise dealers of every detail of incentives included in programs whereby such dealers may sell to fleet operators. Their complaint is not directed at the 96 percent of cases in which such notification is sent to all GM dealers, but to the 4 percent where it is limited to a much smaller number. GM Ex A, pp. 3, 4.

Significantly, none of these plaintiffs have produced one iota of evidence that any of them ever sought to participate in such sales in large volume to national vehicle rental companies. While sales incentives with respect to such programs were directly communicated by GM to those few dealers historically recorded as being interested in such high-volume sales, the information as to such programs was available upon request from GM to any other GM dealer.[11] Had any of these plaintiffs expressed such interest to GM, they would have been afforded the opportunity to seek to sell to fleet purchasers on the same terms and conditions as were made available by GM to any other of its franchise dealers.

For purposes of this portion of the plaintiffs' claims, the complaint of failure by GM to police abuses of its fleet guidelines,[12] centers on the failure to "charge back"[13] those GM dealers situated without New Hampshire who sold the majority of vehicles purchased by Merchants in its capacity as a National franchisee. The record in this respect is that GM investigated the complaints that Merchants was selling fleet purchase vehicles at retail, but was unable to produce clear evidence that the selling dealers had knowledge of or participated in such abuses on the part of Merchants. GM Ex A, p. 12. GM did not, therefore, charge back such dealers, *id.*, preferring to avoid needless litigation when it was not in possession of the clear evidence which would be necessary for it to successfully defend a suit by a dealer thus penalized.

Plaintiffs' argument that GM, rather than its franchise dealers, must be deemed the seller in the fleet purchases complained of is without legal merit.[14] The factual record before the Court demonstrates that at all relevant times GM made available to any interested dealer the opportunity to compete for fleet sales on the same terms and conditions as were available to any other of its dealers.[15] In light of the clear recognition by the New Hampshire Legisla-

---

**10.** RSA 357–C:3 III(f) deems it an unfair method of competition or unfair and deceptive practice for a manufacturer in the position of GM to

[o]ffer, sell, or lease any new motor vehicle to any person, except a distributor, at a lower actual price than the actual price offered and charged a motor vehicle dealer for the same model vehicle similarly equipped or utilize any device which results in such lesser actual price.

**11.** Additionally, information as to the identity of the personnel of large fleet operators was available to all dealers through the trade publication "Automotive Fleet". GM Ex A, p. 4. Plaintiffs clearly had access to this publication, as Appendix 16 to their Response is an excerpt therefrom.

**12.** A subsequent portion of the Opinion discusses Merchants' abuses of the fleet guidelines and the action taken by the defendant with respect thereto.

**13.** Prior to the initiation of its 1984 program, *see,* p. 1153, *supra,* GM's fleet guidelines contained among their sanctions the similar penalty of a "charge back" to the selling dealer.

**14.** The basis of this claim is the plaintiffs' argument that the inclusion of the term "any … solicitation in contemplation of a sale" in the statutory definition of "sale", RSA 357–C:1 XII, must be construed to refer to the actions of GM in its discussions with fleet purchasers as to the incentives that might be included in fleet sales. The Court concurs with the defendant that the quoted language would necessarily refer to a *solicitation by a seller* (i.e., a GM dealer) in contemplation of a sale *by such seller,* and not to the solicitation by a third party (GM) in contemplation of sales by its dealers.

**15.** A dealer afforded with the incentive package provided by GM could seek to further "sweeten" its competitive offer to a fleet purchaser by adding more concessions, such as further price reductions. The availability of such flexibility of competition may be disheartening to the plaintiffs herein, but the Court finds and rules it is not in any manner violative of the provisions of RSA 357–C:3 III(e) and (f).

ture of the differences between fleet and retail sales, a failure to grant plaintiffs the opportunity to purchase for their own resales at retail the same incentives available to fleet sales is not barred by the statutory provisions here relied upon.[16] I find and rule that there is no genuine issue of material fact with respect to the claims advanced pursuant to RSA 357–C:3 III(e) and (f), and that GM is entitled to summary judgment with respect to such claims.

### 3. The "Arbitrary Action" Claims

Prior to 1984, as I have previously discussed, p. 1153, *supra*,[17] GM's fleet guidelines contained requirements for dealer controlled fleets, which differed from those in effect for nondealer controlled fleets. Plaintiffs here contend that the imposition of the stricter requirements on the dealers, taken together with what it considers to be lax enforcement of the fleet guidelines as to Merchants on the part of GM, comprise a violation of the provisions of RSA 357–C:3 I. Complaint ¶¶ 19–27. Plaintiffs additionally allege that this statutory provision was violated because GM gave preference in allocation of vehicles to fleet purchasers, a practice plaintiffs also contend to be violative of RSA 357–C:3 III(a). Complaint ¶¶ 32–34.

As concerns the first of these claims, GM argues that imposition of the stricter requirements on its dealers equates with the mere exercise of a reasonable business judgment.[18] With respect to the specific complaint about the abuse of fleet privileges by Merchants, GM argues that it conducted a realistic and timely investigation following the complaints it received in 1983.[19]

The necessary documentation to prove the veracity of such contentions did not come into the possession of GM until some time after December 1983. GM Ex A, pp. 9, 10. While ordinarily statistical data required to check alleged abuses of fleet programs would not come into possession of GM until the end of a model year (e.g., September), even such information itself is insufficient to determine whether an alleged fleet program abuse exists. *Id.* at 10, 11. Here, Merchants had denied abuses of the fleet program requirements as late as August 12, 1983. GM Ex L. However, GM monitored the 1984 model year data by contracting for the printing of special reports which it received in early calendar year 1984. *Id.* at 11. Some such documentation was not available until late March 1984, and by March 26, 1984, GM had canceled Merchants' fleet privileges. *Id.* at 11, 12.

RSA 357–C:3 I deems it an unfair method of competition and unfair and deceptive practice for any manufacturer in the position of GM "to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of such parties or to the public."

Unfortunately, this provision of the statute contains no definition of the terms "arbitrary", "bad faith", or "unconsciona-

---

**16.** It is also to be noted that GM provides its dealers from time to time with certain incentives for the purposes of resale at retail, and such incentives are not available for resale to fleet purchasers. GM Ex A, pp. 2, 3.

**17.** Dealer controlled fleets were also subject to audit by GM representatives, a requirement which was not imposed on other fleets.

**18.** As earlier detailed, p. 1153, *supra*, GM perceived that such requirements were necessary to prevent its dealers from switching vehicles between retail and fleet inventories.

**19.** Insofar as plaintiffs suggest that there is evidence that such complaints with respect to Merchants were made in 1981, I find and rule that

their evidence supports no such claim. The November 1981 letter from Mr. Saidel, P Res, App 6, does not set forth abuses of fleet guidelines on the part of Merchants. The vague suggestions that Mr. Holloway, P Res, App 9, and Mr. Jackson, P Res, App 6, orally discussed such matters in 1981, absent documentation and specificity as to the time and place and position of GM representatives with whom such complaints were discussed, fall short of raising an actual issue. The record is clear that complaints by dealers to GM that Merchants was abusing fleet privileges by selling at retail were not transmitted to GM until 1983.

ble".[20] The statute elsewhere provides, however, that in construing its provision, a court "may be guided by the interpretations of the Federal Trade Commission Act, as amended." RSA 357–C:14. Helpful in our construction of RSA 357–C:3 I, therefore, is the following oft-quoted language of the FTC describing the factors it considers in determining whether certain business practices are unfair:

'(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking. 29 Fed.Reg. 8355 (1964).

*Quoted in FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 905–06 n. 5, 31 L.Ed.2d 170 (1972).

 It is worthy of repetition that the New Hampshire Legislature in enacting RSA 357–C specifically recognized the necessity of a different approach to fleet sales of motor vehicles, pp. 1154, 1155, *supra.* And I hold such distinctions made here by GM were based on reasonable business practices, and also find and rule that there was no untimely delay by GM in its invoking of sanctions against Merchants for abuse of the fleet guidelines. Additionally I find and rule that there is no factual issue remaining with respect to violations of RSA 357–C:3 I with respect to the first claim advanced by the plaintiffs under that provision of the statute.

Pointing largely to the statistics provided through New Hampshire motor vehicle registrations (and not to sales available from their own records),[21] plaintiffs here claim that at the start of the model year more vehicles were allocated to fleets than to retail when the retail demand was greatest. Plaintiffs say that this discriminatory practice not only violates RSA 357–C:3 I, but is also violative of RSA 357–C:3 III(a), which deems it an unfair method of competition and unfair and deceptive practice for any manufacturer in the position of GM to

[r]efuse to deliver in reasonable quantities, and within a reasonable time after receipt of dealer's order, to any motor vehicle dealer having a franchise or contractual arrangement for the retail sale of new motor vehicles sold or distributed by such manufacturer, distributor, distributor branch or division, or factory branch or division, any motor vehicles covered by such franchise or contract *and* specifically advertised by such manufacturer, distributor, distributor branch or division, or factory branch or division to be available for immediate delivery....

(Emphasis added.)

Where the conjunctive term "and" is used in a statute, the legislative intent discerned is that all of the requirements of the statute must be fulfilled. 1A Sands, *Suth-*

---

**20.** The term "arbitrary" may be defined as being synonymous with bad faith or failure to exercise honest judgment. *Black's Law Dictionary* 96 (5th ed. 1979). And "bad faith", the opposite of "good faith", may be defined to imply the conscious doing of a wrong because of a dishonest purpose. *Id.* at 127. The term "unconscionable" generally has reference to contractual terms which are one-sided or oppressive. *Id.* at 1367.

**21.** Mr. Lahey, general manager of Yanco Pontiac-Cadillac, a GM dealer, seeks to compare *deliveries* of a certain model of a Pontiac vehicle to retail *sales* in the period October-November 1984. Presumably, the Yanco dealership has available records which would enlighten the Court as to whether such *deliveries* were from *sales* made by Yanco from its own allocations or from *sales* made by dealers without New Hampshire to fleet operators within New Hampshire. Absent such clarification, the comparison is akin to "apples vs. oranges" and furnishes no factual basis for suggesting that as to allocations made to New Hampshire dealers GM discriminated at the start of a model year in sales to fleet operators. P Res, App 21, p. 2.

*erland Statutory Construction* § 21.14 (Singer rev. 4th ed. 1985).[22] Accordingly, it falls to plaintiffs to prove that RSA 357–C:3 III(a) was violated in that GM "specifically advertised" its vehicles "to be available for immediate delivery". *Id.* Significantly, however, although its complaints focus on model years prior to 1985, its only proffer of evidence in this regard is an advertisement for 1985 GM vehicles. P Res, App 6, Attachment G.

▮▮▮ GM's national advertising manager has stated under oath that in fact GM does not and never has advertised any of its models of motor vehicles for immediate delivery. GM Ex D. I find and rule that plaintiffs' proffer of evidence is insufficient to sustain its burden that any actions on the part of GM were violative of the provisions of RSA 357–C:3 III(a) (or of RSA 357–C:3 I), and that there are no factual issues which require further proceedings with regard to these aspects of plaintiffs' claims.[23]

### 4. The "De Facto Franchise" Claims

During the period of time that it was eligible to participate in the fleet programs of GM, Merchants was afforded certain privileges such as "drop shipment"[24] of vehicles which it purchased through GM dealers, the right to conduct predelivery inspection and servicing of its fleet vehicles, and the right to provide warranty repairs to its fleet vehicles. GM Ex A, pp. 18, 19. Plaintiffs claim that the grant of such privileges by GM to Merchants equates with the granting of a competitive franchise in violation of the provisions of RSA 357–C:3 III($l$) and 357–C:9. Complaint, ¶¶ 35–37.

RSA 357–C:3 III($l$) prevents manufacturers in the position of GM from granting "a competitive franchise in the relevant market area previously granted to another franchise" unless the provisions of RSA 357–C:9 have been complied with. In turn, RSA 357–C:9 requires that notice of intent to establish such franchise be given with opportunities for protest and hearing at the request of any established dealer.[25] However, the statutory provision is limited by its terms to "a *franchise* establishing an additional *new* motor vehicle dealership". *Id.,* at I (emphasis added).

The statutory definition of "franchise" is limited to an

> oral or written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a motor vehicle dealer a license to use a trade name, service mark, or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services at wholesale, retail, leasing or otherwise.

RSA 357–C:1 IX.

And the definition of "new motor vehicle dealer", *supra,* p. 1154 n.9, requires that

---

**22.** The New Hampshire courts apply the general rule as set forth in the citation from *Sutherland, supra.* See *Boyce v. Concord General Mutual Insurance Company,* 121 N.H. 774, 777, 435 A.2d 510, 512 (1981) (use of the disjunctive term "or").

**23.** Were it necessary to proceed with analysis of the registration data on which the plaintiffs rely, I would find such to be irrelevant in light of the clear evidence that most of the vehicles purchased by Merchants for its fleet inventory were procured from GM dealers whose places of business were without the state of New Hampshire. The vehicles allocated to such dealers for fleet uses were obviously not subtracted from any allocation made to New Hampshire dealers.

**24.** For example, if Merchants ordered a number of vehicles for its fleet from a GM dealer whose place of business was in New York State, ar-

rangements would be made to deliver or "drop ship" those vehicles from the factory directly to Merchants' place of business in New Hampshire, rather than making delivery to the business premises of the selling dealer located in New York.

**25.** The protest is to be made to the New Hampshire Attorney General, who then notifies the manufacturer of the filing of such protest and advises that no franchise can be established until a hearing is held before the Superior Court of New Hampshire and a ruling thereon has been rendered. RSA 357–C:9, *supra.* The terms of this statute are similar to those upheld by the Supreme Court in *New Motor Vehicle Board of California v. Orrin W. Fox Company,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978).

such dealer hold a franchise. RSA 357–C:1 VIII(b). The record is here clear that only GM dealers are granted a franchise which complies with the terms of this statute. GM Ex B. Indeed, the GM fleet warranty service station agreement forbids fleet operators from using the "trade name, service mark, or related characteristic", which is the core of the definition of "franchise" contained in RSA 357–C:1 IX. *See* P Res, App 18, ¶ 12 of Fleet Warranty Service Station Agreement.

■ Accordingly, I find and rule that the privileges afforded fleet operators in the position of Merchants by GM do not fall within the requisite statutory definitions such as to call into play here the "competitive franchise" obligations of RSA 357–C contained in subsection 3 III(*l*) and 9.

### 5. The Applicability of RSA 358–A

■ The plaintiffs here contend that the provisions of RSA 357–C are designed merely to supplement the provisions of RSA 358–A. Accordingly, they also claim the right to recover for violations of the methods of competition or unfair or deceptive acts prohibited by RSA 358–A:2. Complaint, ¶¶ 39–42. Specifically, it is alleged that the operation of the fleet programs of GM violated the provisions of RSA 358–A:2 II, which makes illegal any practice capable of "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services".

Additionally, plaintiffs contend that the GM fleet programs violate the provisions of RSA 358–A:2 III, which makes illegal a practice capable of "[c]ausing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another".

Originally enacted in 1970, RSA 358–A provides for the "Regulation of Business Practices for Consumer Protection". RSA 357–C, the statute which provides for "Regulation of Business Practices Between

Motor Vehicle Manufacturers, Distributors and Dealers", was originally enacted in 1973, and was subsequently repealed and reenacted in 1981.[26]

Although it is not a mirror image, RSA 358–A is a substantial counterpart of an earlier Massachusetts consumer statute enacted as M.G.L. c. 93A. Similarly, RSA 357–C closely follows the provisions of a prior Massachusetts statute designed to regulate similar business practices as set forth in M.G.L. c. 93B. Defendant here contends that as it is the specific statute designed to cover the type of practices here complained of by plaintiffs, only RSA 357–C has application to this action. The New Hampshire courts have long followed the well-established rule, 2A Sands, *Sutherland, supra,* § 51.05, that where conflicts exist as between a general and a specific statute, the provisions of the specific statute are to be applied. *In re Laurie B.,* 125 N.H. 784, 789, 489 A.2d 567, 570 (1984); *Board of Selectmen of the Town of Merrimack v. The Planning Board of the Town of Merrimack,* 118 N.H. 150, 152, 383 A.2d 1122, 1124 (1978). And in construing RSA 358–A, the New Hampshire Court has not hesitated to follow the lead of Massachusetts courts in their construction of M.G.L. c. 93A. *Chase v. Dorais,* 122 N.H. 600, 448 A.2d 390 (1982).

The Massachusetts courts have had the occasion to consider conflicts as between the application of the provisions of M.G.L. c. 93A and 93B. In *Reiter Oldsmobile, Inc. v. General Motors Corporation,* 378 Mass. 707, 393 N.E.2d 376 (1979), the plaintiff dealer sought to enjoin the granting of a competitive franchise, but opted to do so only pursuant to the provisions of the general consumer statute set forth as M.G.L. c. 93A. The Massachusetts court ruled that even were it to assume that both 93A and 93B were applicable, the case was governed solely by the specific provisions of

---

**26.** RSA 357–C was originally enacted as Chapter 357–B in 1973, and was replaced by its current version in 1981.

93B. *Id.* The Court stated in relevant part—

Assuming, however, that GMC's conduct violated both c. 93A, § 2(a), and c. 93B, § 3(a), we think that the provisions of c. 93B must govern Reiter's remedy. Chapter 93A is a statute of general application to all trade and commerce. Chapter 93B was enacted after c. 93A and applies specifically to unfairness in one industry. It is a self-contained statute, prescribing specific remedies for its violation. The Legislature was aware of the private injunctive relief available under c. 93A, § 9, but made explicit reference in c. 93B, § 12, only to the damage remedy set forth in § 9, excluding by implication injunctive relief. The two statutes may overlap in their coverage, but in the case of a conflict, the provisions of the specific statute must govern. *See Pereira v. New England LNG Co.,* 364 Mass. 109, 118–119, 301 N.E.2d 441 (1973), and cases cited. To hold otherwise would be to overlook the careful limitation on private remedies in c. 93B and render much of the statute surplusage.

*Reiter Oldsmobile, Inc. v. General Motors Corporation, supra,* 393 N.E.2d at 378.

■ I find and rule that under the circumstances of this case the plaintiffs herein are not entitled to seek relief pursuant to the provisions of RSA 358–A, but that they are confined to the provisions of RSA 357–C.

*6. Conclusion*

The results herein reached have made it unnecessary for the Court to consider any of the constitutional arguments advanced by the parties herein.[27] The practice of making separate allocations of vehicles for fleet operators is apparently not unusual, *Parsons v. Ford Motor Company,* 669 F.2d 308 (5th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982), and this may well explain the reason why the New Hampshire Legislature expressly rec-

ognized the practice in certain provisions of RSA 357–C previously detailed.

Upon careful review of the pleadings, legal memos, and documents filed in support of and against the motion for summary judgment, I herewith find and rule that there remain no "genuine issues of material fact", Rule 56(c), Fed.R.Civ.P., and I direct that summary judgment be entered for the defendant as to all aspects of the plaintiffs' complaint herein.

SO ORDERED.

---

**27.** Were the construction of RSA 357–C advanced by these plaintiffs to be here adopted, however, the Court foresees that serious constitutional questions would be raised thereby.