**NEW HAMPSHIRE AUTOMOBILE DEALERS ASSOCIATION, INC., et al., Plaintiffs, Appellants,**

**v.**

**GENERAL MOTORS CORPORATION, Defendant, Appellee.**

No. 85–2022.

United States Court of Appeals, First Circuit.

Argued June 4, 1986.

Decided Sept. 17, 1986.

Kenneth A. Cohen with whom Robert D. Paul, Loretta M. Smith, Goodwin, Procter & Hoar, James R. Muirhead and McLane, Graf, Raulerson & Middleton, P.A. were on brief for plaintiffs, appellants.

John H. Henn with whom Peter B. Ellis, Bruce R. Parker, Foley, Hoag & Eliot, Howard Myers, Myers & Laufer, and Joyce S. Kornbluh, General Motors Legal Staff, were on brief for defendant, appellee.

Before BOWNES, Circuit Judge, BROWN,[*] Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

Several New Hampshire General Motors auto dealers and their trade association (the Dealers) have sued GM, claiming that it violated a New Hampshire law that protects dealers from a manufacturer's unfair or discriminatory conduct. N.H.R.S.A. c. 357–C. The district court, 620 F.Supp. 1150, granted summary judgment for General Motors, and the Dealers appeal. We conclude that summary judgment was correct with respect to each of the Dealers' claims but one, where further proceedings are necessary.

### I.

This case arose out of GM's "fleet" car program—a program that accounts for about one-fourth of all GM sales. A fleet buyer is a firm or organization, like a rental car agency or a firm with a large sales force, that buys ten or more new GM cars in a year. GM offers fleet buyers special discounts that may take the form of special interest rates, cheaper accessories, or a lower price for the cars themselves. In the case of especially large fleet buyers, GM may negotiate with the buyer directly. Once it determines the special terms, GM tells its dealers (at least those that it knows are interested) about the terms and the buyer. GM tells the dealers that it will provide them with the fleet cars at a special dealer price, low enough for them to resell to the fleet buyer at the fleet rate while still earning a small profit. The fleet buyer then shops among interested dealers. Since the buyer is typically large enough to shop among several dealers, competition among the dealers usually guarantees that the fleet buyer will receive the cars at the fleet rate. In principle, dealer competition could lead to an even lower price, should some dealer prove willing to accept a smaller profit. GM sometimes ships the car directly from factory to buyer; but, as a legal matter, title to the car passes from GM to the dealer and then to the buyer.

Fleet buyers are not supposed to resell their discounted cars to the general public, at least not while they are new. Each of them makes a promise to that effect, signing a statement that reads something like the following:

---

[*] Of the Fifth Circuit, sitting by designation.

A Qualified Fleet User is defined as any company ... which has purchased and registered or leased ten (10) or more new cars and/or trucks *solely for use in its operation*.... The dealer's customer, ... by executing this enrollment form, certifies it is a Qualified Fleet User, acknowledges the fleet program eligibility requirements specified herein and agrees to comply with them.

(A. 748, 596; emphasis added.) In addition GM has created certain enforcement rules. It has insisted that typical fleet buyers hold any new car for at least three months before selling it. And, it has told each dealer that it will "charge back" the price discount it granted should it discover that a fleet buyer, buying from that dealer, did not buy the (cheaper) car for its own use, but sold the car to the public while it was new.

Occasionally (but apparently not very often), a fleet buyer has violated the GM program's 'for my own use' condition. The resale activity of one such violator, Merchants Rent-A-Car (a New Hampshire licensee of National Car Rental), led to this litigation. Merchants sold at least 30 new fleet cars to the public. Regular New Hampshire GM dealers, angered at Merchants' competition and at what they saw as lax GM enforcement of its rules, then brought this law suit.

Initially, in the district court, the Dealers made a series of broad legal claims, including the claim that GM's fleet program itself amounts to the type of discriminatory discount-price sale that the New Hampshire statute forbids. The Dealers lost on all their claims in the district court. They now appeal, but in doing so they explicitly restrict their appeal to only three of the claims they raised below. They say that GM's failure to enforce the 'for my own use' rule against Merchants violated (1) the New Hampshire statute's prohibition of manufacturers' selling cars at discriminatory prices; (2) the statute's prohibition of manufacturers' taking actions that are "arbitrary," "unconscionable," or "in bad faith"; and (3) the statute's requirement

that GM follow certain explicit procedures when creating a new franchised dealer. We shall consider each of these claims in turn.

## II.

The Dealers argue that GM's 'sales' to Merchants violated the 'price discrimination' provision of the statute. N.H.R.S.A. c. 357–C:3(III)(e). That provision says that a manufacturer shall not

*[o]ffer to sell or ... sell any new motor vehicle at a lower actual price than the actual price offered to any other motor vehicle dealer for the same model vehicle similarly equipped or utilize any device* including, but not limited to, sales promotion plans or programs *which result in a lesser actual price.* However, the provisions of this subparagraph shall not apply to sales to a motor vehicle dealer for resale to any unit of government; nor to sales to a motor vehicle dealer of any motor vehicle ultimately sold, donated or used by such dealer in a driver education program. The provisions of this subparagraph shall not apply so long as a manufacturer, distributor, or any agent thereof, offers to sell or sells new motor vehicles to all motor vehicle dealers at an equal price.

(Emphasis added.) The Dealers say that GM offered to sell or sold (fleet) cars to Merchants "at a lower actual price" than the price at which it sold (non-fleet) cars to other dealers. Perhaps because a court might not consider Merchants to be a "motor vehicle dealer" (thereby making subparagraph (e) inapplicable), the Dealers also say that this conduct violates subparagraph (f), which says that a manufacturer may not

[o]ffer, sell, or lease any new motor vehicle to *any person* ... at a lower actual price than the actual price offered and charged a motor vehicle dealer for the same model vehicle similarly equipped or utilize any device which results in such lesser actual price.

N.H.R.S.A. c. 357–C:3(III)(f) (emphasis added). Even if Merchants isn't a "dealer"

within the terms of (e), it is a "person" within the terms of (f); and, the Dealers say, GM has offered to sell (and has sold) Merchants fleet cars at "lower actual price[s]" than the prices that regular GM dealers must pay for non-fleet cars.

The district court rejected a similar argument when the Dealers advanced it as a ground for holding unlawful GM's entire national fleet program. In doing so, the district court advanced several reasons, including three that are relevant to this more limited appeal. First, it held that GM did not "sell," nor did it "offer to sell," cars to Merchants. Rather, it 'sold' its cars to dealers, who resold them to fleet buyers such as Merchants. The court recognized that the New Hampshire statute defines the word "sale" broadly to include "solicitation in contemplation of a sale." N.H.R. S.A. c. 357–C:1(XII). But the district court held that the word "solicitation" refers to a solicitation made by one who *himself* intends to make the sale. GM did not intend to sell to Merchants itself; rather, it sold fleet cars to dealers and the *dealers* sold the cars to the fleet buyers.

Second, the district court recognized that any broad definition of the word "sale" would likely make the practice of fleet sales unlawful, because GM's fleet purchasers in fact pay less than GM dealers for the "same" non-fleet "model vehicle[s] similarly equipped." Yet, it believed that a broad definition was not required in light of the fact that the New Hampshire statute does not seem primarily aimed at stopping fleet sales. The legislature enacted it against a background of known fleet sales. Its awareness of the existence of fleet sales is indicated by the statute's specific reference to fleet sales to government units and driver education programs. Had the legislature intended to try to outlaw this widespread and important practice, it would seem likely to have prohibited it explicitly, rather than by hoping for an especially broad interpretation of the word "sale."

Third, the court feared that a broader interpretation of the New Hampshire statute would raise serious questions under the Commerce Clause of the federal Constitution. Unlike the Dealers, we do not find these fears fanciful. For one thing, to interpret the New Hampshire statute as forbidding GM's fleet sale program within New Hampshire significantly risks affecting fleet sales outside New Hampshire. Auto makers may find it difficult to guarantee that fleet cars bought by national rental agencies, such as Avis, Hertz or National, do not find their way to New Hampshire licensees of those agencies. Auto makers may also find it difficult to control resales by their dealers in nearby states: Merchants, for example, bought many of its cars from dealers in other New England states. As a general matter of economics, other things being equal, the lower the price for which GM sells its cars outside New Hampshire, the harder it will be to stop out-of-state purchasers from reselling those cars inside New Hampshire. For this reason, a New Hampshire law forbidding (and assessing damages for) low-priced fleet sales within New Hampshire could, if interpreted to reach rental car purchases from out-of-state GM dealers, lead GM to restrict the fleet program—or increase the cost of fleet cars—in nearby states, thereby hurting the consumers who live there. *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.,* —— U.S. ——, —— – ——, 106 S.Ct. 2080, 2085–86, 90 L.Ed.2d 552 (1986) ("While a State may seek lower prices for its consumers, it may not insist that producers or consumers in other States surrender whatever competitive advantages they may possess."); *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 521, 55 S.Ct. 497, 499–500, 79 L.Ed. 1032 (1935) (a state "has no power to project its legislation into [another state] by regulating the price to be paid in that state for [a product] acquired there").

For another thing, fleet sales to New Hampshire car rental and leasing agencies offer car makers (all of whom are out of state) greater access to those New Hampshire consumers who rent or lease cars. A statute that forces an increase in the price

of those cars restricts out-of-state opportunities to reach those consumers; it will likely depress sales and thereby limit both the out-of-state supply that reaches New Hampshire and the opportunity of out-of-state workers to produce that supply. *See Dean Milk Co. v. City of Madison,* 340 U.S. 349, 356, 71 S.Ct. 295, 298–99, 95 L.Ed. 329 (1951) (holding that a regulation requiring that milk be locally produced "must yield to the principle that 'one state in its dealings with another may not place itself in a position of economic isolation' ") (quoting *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. at 527, 55 S.Ct. at 502).

Further, such a restriction would limit New Hampshire consumers' ability to take advantage of one of the major benefits of a national market, namely the ability to circumvent the local seller who charges a price that is too high (or provides a service that is too poor) by purchasing instead from an out-of-state seller who offers similar (or related) goods and services at a lower price. *See Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 539, 69 S.Ct. 657, 665–66, 93 L.Ed. 865 (1949) ("Our system, fostered by the Commerce Clause, is that ... every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any.").

Finally, the given purpose of the statute is to a degree overtly protectionist. It seeks "to prevent frauds, impositions, and other abuses and *to protect and preserve the investments and properties of the citizens of this state.*" N.H.R.S.A. c. 357–C, Declaration of purpose (emphasis added). Insofar as the statute was designed simply to increase prices or profits of New Hampshire dealers at the expense of competitors and their out-of-state suppliers, it offends the most basic Commerce Clause principle: "that our economic unit is the Nation." *Hood & Sons, Inc. v. Du Mond,* 336 U.S. at 537, 69 S.Ct. at 665; *see City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2534–35, 57 L.Ed.2d 475 (1978).

All this is not to say that the statute violates the Commerce Clause or would do so if interpreted as the Dealers wished. It is to say that these four factors—influencing the price of fleet sales transactions outside New Hampshire, limiting access by out-of-state manufacturers to New Hampshire consumers, limiting access by New Hampshire consumers to out-of-state sources of supply, and protecting New Hampshire retailers from outside competition—*taken together* suggest the possibility of a burden on commerce disproportionate to the interest the statute serves. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (a statute that only incidentally regulates commerce "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits"); *see also Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 441–42, 98 S.Ct. 787, 794–95, 54 L.Ed.2d 664 (1978) (invalidating Wisconsin law forbidding double-trailer trucks); *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977) (invalidating North Carolina law forbidding the use of Washington State grading system on apples shipped into North Carolina). This possibility makes understandable, and legally proper, the district court's efforts to interpret the statute to avoid these constitutional problems. And, for present purposes, it leads us to accept the district court's interpretation of the words "sell" and "offer to sell" in the New Hampshire statute as legally correct. *Cf. Bishop v. Wood,* 426 U.S. 341, 345–47 & n. 10, 96 S.Ct. 2074, 2078 n. 10, 48 L.Ed. 684 (1976) (paying deference to the views of district and appeals courts on unsettled question of state law); *Rose v. Nashua Bd. of Educ.,* 679 F.2d 279, 281 (1st Cir.1982) ("[W]e are reluctant to interfere with a reasonable construction of state law made by a district judge, sitting in the state, who is familiar with that state's law and practices.").

This background makes it easier to understand our conclusions in respect to the specific arguments that the Dealers raise on this appeal. They now claim that

GM's 'sale' to Merchants violates subparagraph (e) or (f) *in light of Merchants' resale of the new cars.* They say that GM's dealings with Merchants amounted either to a "sale" within the meaning of the statute or at least to a "device" that "results in such lesser actual price." The first of these possibilities, however, is foreclosed by the district court's interpretation of "sale," which we have discussed above. *See supra* at pp. 531–32. If "sale" takes the broader meaning the Dealers suggest, then all of GM's fleet transactions amount to sales, and GM's fleet program should seem illegal under the statute; but, the Dealers have abandoned their argument that GM's entire fleet program violates the statute. To distinguish GM's transactions with Merchants from those with other fleet purchasers, the Dealers point only to GM's neglect in failing to detect and discipline Merchants' resale activities. But we can find nothing in the statute to suggest that the same word "sale" means two different things depending upon further (resale) actions of a 'buyer.'

■ The more serious argument of the Dealers concerns the word "device." They claim that a fleet program that places cheaper cars in fleet buyers' hands allows those buyers to compete with regular dealers on the basis of discriminatorily favorable prices. They argue that the fleet program therefore amounts to a *device* to sell at such illegally low prices *when the fleet buyer in fact resells new cars and thereby actually engages in such competition.* The problem with this argument, however, is that the statute focuses upon the actions of the manufacturer, not those of the fleet buyer. That being so, we can understand how a manufacturer who *intended* a fleet buyer to resell new cars in competition with existing dealers might be accused of using a "device" to circumvent the literal language of the statute. But, we do not see how a manufacturer who is occasionally neglectful or even arbitrary in enforcement, without an element of intent or desire, can be said to have used a "device" to unlawfully discriminate in price within the

meaning of subparagraph (e) or (f). Indeed, given the difficulty of enforcing GM's fleet buyer program perfectly, to interpret the statute more strictly could resurrect certain of the Commerce Clause problems previously discussed. *See supra* at pp. 531–532.

For these reasons, we can find no violation of subparagraph (e) or (f) of the New Hampshire statute.

### III.

The Dealers next point to the duty imposed upon GM by N.H.R.S.A. c. 357–C:3(I) not "to engage in any action which is arbitrary, in bad faith, or unconscionable." On this appeal they say that GM violated this duty in three separate ways.

■ First (despite their statement at oral argument limiting their appeal to GM's transactions with Merchants), the Dealers argue in their brief that GM failed *as a general matter* to provide adequate safeguards against a fleet buyer reselling new cars to the general public. The record reveals, however, that each participant in GM's fleet program, by signing an agreement to comply with fleet program eligibility requirements, promised not to resell new cars. *See supra* at pp. 529–30. It also shows (without significant contradiction) that fleet buyers only rarely broke these promises, that they rarely abused the program, that between April 1984 and August 1985 GM received complaints of fleet program violations concerning only about twenty fleet buyers out of 17,000, and that the case of Merchants Rent-A-Car was the most egregious violation of the fleet plan in the nation. (A. 588, 597.) Under these circumstances, we agree with the district court that, as a matter of law, the Dealers failed to show that General Motors' general system of 'safeguards' was inadequate.

Second, in a related claim, the Dealers argue that GM acted arbitrarily in imposing more rigorous 'enforcement' rules on franchised car dealers who also bought fleet cars for *their own* (separate) fleets than upon ordinary fleet buyers. GM re-

quired an ordinary fleet buyer, such as Hertz, to keep all fleet cars for at least *three* months before selling them; but it required franchised GM dealers who also ran a rent-a-car business to keep new fleet cars (purchased for rental or leasing) for at least *four* to *six* months before reselling them. (A. 939.) GM says, however, that these rules were aimed at making certain that fleet buyers really bought fleet cars for their own use, not to resell them. A GM dealer who also ran a rent-a-car business might find it easier than a pure rental dealer to evade the basic 'for my own use' promise without detection, for it could (according to GM) juggle cars between its new-car sales stock and its rental fleet. For this reason, GM imposed a longer absolute "holding period," as well as stricter record-keeping guidelines and monitoring procedures, upon the franchised dealers. GM's explanation is plausible; nothing in the record significantly contradicts it. Thus, we agree with the district court's holding that, on the basis of the record, the Dealers could not show that the difference in enforcement rules was "arbitrary."

Third, the Dealers claim that GM was "arbitrary" or acted "in bad faith" in failing to move quickly enough to stop Merchants from breaching its promise and reselling new fleet cars to the general public. The record contains evidence sufficient to show:

a) that, in November 1981, one New Hampshire dealer complained about resales by Merchants (A. 344–45);

b) that, in mid–1982, GM's area fleet manager and Merchants' president met and discussed the problem (A. 881);

c) that, on January 28, 1983, GM's area director wrote to GM: "after viewing [Merchants'] operation . . . there is no doubt in my mind, and it is my opinion that Merchants Rent A Car is selling new cars to retail customers, to what extent I cannot tell at this time" (A. 880–81);

d) that, in April 1983 and in August 1983, GM received documentation from New Hampshire dealers of sales of three new cars by Merchants (A. 366, 370–76, 337, 346);

e) that, between July 13 and August 23, 1983, Merchants sold thirty new cars (i.e., with odometer readings of from 2 to 104 miles) to the public (A. 388–420);

f) that, sometime after August 12, 1983, in order to determine whether Merchants had resold new fleet cars, GM contracted for a special report about Merchants from R.L. Polk Co. (which compiles auto registration data for the industry) (A. 584);

g) that, in late March 1984, GM received Polk's final report showing abuses, and soon thereafter it received a report from the New Hampshire Attorney General, also describing Merchants' abuses (A. 426–61, 584–85); and

h) that GM then took away Merchants' right to buy GM fleet cars (A. 752).

The Dealers say that GM's enforcement actions were too little and too late: 'too little,' because GM did not penalize the GM dealers who sold to Merchants (it did not charge them back the fleet discounts with respect to the new cars that Merchants sold at retail); 'too late,' because GM did not act for more than two years from the time of the initial complaints and for more than a year after it had fairly firm evidence of Merchants' violations.

GM has produced lengthy explanations of its course of conduct. It says, for example, (1) that the initial complaints were vague and unspecific; (2) that after its initial contacts with Merchants, Merchants repeatedly and explicitly promised to live up to its agreement; (3) that it must be careful not to terminate a fleet buyer without adequate evidence, lest it provoke a lawsuit; (4) that gathering the evidence is difficult and time consuming, requiring something like the seven-month R.L. Polk study; (5) that it acted responsibly and quickly after getting the necessary evidence; and (6) that it could not easily "charge back" its dealers, for it did not

have sufficient evidence of their knowing violations.

■ GM's explanations are plausible; and the brute facts on which they rest are not disputed. Yet, we think the district court ought not to have granted summary judgment in GM's favor on this point. GM's explanations rest primarily upon the deposition evidence of Franklin N. Vader, a GM executive. His demeanor on the stand and his credibility under cross-examination may affect the weight to be given his statements. Thus, the district court should hear Mr. Vader testify. It also should hear the Dealers' witnesses so that it may estimate the strength and specificity with which the Dealers called the problem to GM's attention. Then it can decide whether GM's enforcement actions were "arbitrary," "unconscionable," or "in bad faith" within the meaning of the statute. We cannot say, on the basis of this record, that no reasonable trier of fact could decide those questions in the Dealers' favor.

### IV.

■ Finally, the Dealers argue that, by continuing to sell to Merchants after it found out about the new car resales, GM effectively made Merchants a new car "franchised dealer" without satisfying the necessary statutory requirements. N.H.R.S.A. c. 357–C:3(III)(*l*) (prohibiting a car manufacturer from granting "a competitive franchise ... other than in accordance with the provisions of this chapter"); N.H.R.S.A. c. 357–C:9 (stating procedural requirements for establishing a competitive franchise).

The statute, however, defines "franchise" as

an oral or written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a motor vehicle dealer a license to use a trade name, service mark, or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services at wholesale, retail, leasing or otherwise.

N.H.R.S.A. c. 357–C:1(IX). And, the district court could properly find that GM did not grant Merchants "a license to use" its "trade name" or "service mark." The agreements that Merchants signed in order to qualify as a fleet buyer contained language to the contrary. For example, the agreement with GM's Oldsmobile division said that the

Fleet Operator by reason of the execution of this Agreement is not granted any right to sell new Oldsmobile motor vehicles or chassis, or any right to use the word "Oldsmobile" or any other trademark or service mark....

(A. 496.) The record contains no evidence at all that GM granted Merchants the right to use its name or mark.

The Dealers argue that the simple fact that GM permitted (for a time) Merchants to resell new cars (in violation of its promise) amounts to a license, for the buying public might have *thought* that Merchants was a franchised dealer. But, the "franchise" section of the New Hampshire statute refers to legal reality (whether or not Merchants *actually* had a license). Nothing in it suggests it is meant to apply simply to public appearance. The Dealers have pointed to no case law or legislative history suggesting otherwise. Thus, the district court properly granted summary judgment for GM on the issue.

### V.

We remand this case to the district court for further proceedings with respect to one of the Dealers' claims: that GM did not act quickly and effectively enough to enforce its restriction on Merchants' resale of new fleet cars and thus violated N.H.R.S.A. c. 357–C:3(I). In all other respects, we affirm the court's judgment. The judgment of the district court is

Affirmed in part with the remainder vacated and remanded for further proceedings consistent with this opinion.