# United States Court of Appeals

## For the First Circuit

No. 02-2338

LIBERTY MUTUAL INSURANCE COMPANY and
LIBERTY MUTUAL FIRE INSURANCE COMPANY,

Plaintiffs,

v.

NIPPON SANSO K.K. and THE THERMOS COMPANY,

Defendants, Appellants/Cross-Claimants,

v.

HOUSEHOLD INTERNATIONAL, INC.,

Defendant, Appellee/Cross-Claimant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before
Boudin, Chief Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

David E. Springer with whom Dhananjai Shivakumar, Dennis M. Kelleher, and Skadden, Arps, Slate, Meagher & Flom LLP were on brief for appellants.
David M. Schiffman with whom Sidley Austin Brown & Wood, Joseph L. Kociubes and Bingham & McCutchen LLP were on brief for appellee.

June 9, 2003

BOUDIN, Chief Judge. This appeal is one phase of commercial litigation that has lasted over a decade. It involves liabilities pertaining to insurance coverage provided by Liberty Mutual Insurance Company and an affiliate (jointly "Liberty"). There is now little factual dispute but the contractual provisions (reprinted, in pertinent part, in an appendix to this opinion) are complex. We begin with a summary description of the background and procedural progress of the case, reserving detail for discussion of the several remaining disputes.

In January 1989, Household International, Inc. ("Household"), decided to divest certain assets, either in spin-offs to shareholders or through outright sales to third parties. The Thermos Company ("Thermos") was one of the subsidiaries formed as part of Household's reorganization plan, and various assets and liabilities from the rest of Household were transferred to Thermos through a series of assignment and assumption agreements ("A&A agreements"). In June 1989, after an intensive weekend negotiation, Household entered into a 139-page purchase agreement ("purchase agreement"), to sell Thermos to Nippon Sanso K.K. in a cash-for-share transaction for $134 million (the latter two entities collectively "Nippon").

The purchase agreement had to be completed quickly, yet the underlying insurance policies--themselves only one aspect of the purchase--were complex and covered a number of Household

companies including Thermos. Negotiations were conducted under threat of a scheduled auction of Thermos by Household, and apparently the negotiators lacked first-hand knowledge of the insurance policies. Nevertheless, the purchase agreement made quite specific arrangements to allocate the still-open burdens and benefits of policy periods preceding the sale of Thermos.

For the purpose of the present disputes, it is critical to understand just how pre-sale policy periods could have post-sale consequences. Liberty Mutual insured Household for the years 1984-1988.[1] The insurance covered three lines--workers' compensation, general liability and automobile claims--each covered by a separate policy. Each policy covered a one-year period (e.g., one policy provided automobile coverage for 1984) and each policy was occurrence-based, meaning that it insured against losses for occurrences in one policy year regardless of the time of claim. Subject to limitations periods, claims might easily be made long after the policy year.

The premiums for each policy consisted of two elements. The first is known as the initial premium, which is a projected amount determined in advance of the policy year and based on information submitted by Household to Liberty. This initial

---

[1]The policies were formally issued to a subsidiary of Household, and Household and all Household subsidiaries were listed as named insureds, but this detail can be disregarded.

premium is paid to Liberty in installments over five years, and these installments are known as deferred premiums.

The second element consists of "retrospective premium adjustments," known as retros, which are adjustments to the initial premium amount based on actual claims experience. Retros are assessed annually, beginning approximately twenty months after the policy period expires. For example, the 1984 automobile policy, although covering only accidents occurring in 1984, may result in retros in 1987, 1988, and so on. Because the actual claims experience can (indeed probably will) diverge from the initial projection, retros can result in either credits (refunds from Liberty to Household) or debits (further payments by Household to Liberty). Either way, retros do not alter the obligation to complete the deferred payments of the initial premium.

Thus, one set of issues posed by the sale concerned post-sale responsibility--as between Household and Nippon--for amounts owed or coming due as a result of policies covering the pre-sale years. These issues included (1) who was responsible for paying deferred premiums still unpaid at the time of sale, and (2) who would pay retro debits and/or benefit from retro credits as actual claims experience generated new retros.

To the extent that Nippon was responsible for any of these payments, a second set of issues concerned the proper allocation of Thermos's proportionate share as between it and

-4-

Household. Before the sale each <u>single</u> policy covered a number of Household businesses, including operations that were retained by Household or otherwise disposed of under the plan of reorganization. Prior to Household's 1989 reorganization, it internally allocated retros to each profit center, including the Thermos operations; it made the internal allocation according to a method known as the "traditional method."

The purchase agreement explicitly addresses retros and the allocation of retros between Thermos and other Household units; but the provisions are more usefully described in conjunction with the analysis of legal issues later in this decision. <u>See</u> purchase agreement § 5.10(b). In addition, the purchase agreement contains a representation by Household that, while arguably unclear in its literal language,[2] both sides now treat as warranting that the initial premium (including deferred installments) due Liberty for the pre-sale policy years had already been paid. The agreement also contains an indemnification clause: section 9.2 obligated Household to indemnify Nippon against "all Losses and Claims based upon, arising out of, or resulting from . . . any failure of

---

[2]"All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid . . . . Such policies are sufficient for compliance with all requirements of law . . . and will remain in full force and effect through the respective dates set forth in Schedule 3.12 without the payment of additional premiums." Purchase agreement § 3.12.

[Household] to perform in all material respects [its] obligation under [the purchase agreement]."

After the sale of Thermos, Household continued to provide, for a fee, certain administrative services with respect to the insurance policies written by Liberty. Household apportioned to Nippon a share of the credit and debit retros, and it also billed Nippon for a portion of the deferred premiums; all of these apportionments were done according to the traditional method. Nippon paid the assessments, including about $1.6 million in deferred premiums, until around March 1992 when Household, taking the view that Nippon should pay Liberty directly for deferred premiums and retro debits, tired of this middleman function and stopped paying Liberty on Nippon's behalf.

Liberty then sued Household in the federal district court in Massachusetts in May 1992. Roughly at the same time, Nippon stopped reimbursing Household for retros and deferred premiums. Household reacted by suing Nippon in state court in Illinois. The two actions were effectively consolidated in the district court litigation when Liberty added Nippon as a defendant in the Liberty-Household suit and the two defendants--Household and Nippon--filed cross claims against each other. The parties agree that Illinois law supplies the substantive rules of decision.

In September 1997, after a two-week bench trial, the district court issued a decision on a set of issues between

Household and Nippon. Among other rulings, it determined that Household rather than Nippon was liable for all of the deferred premiums and owed Nippon $1.6 million in restitution; that as to the allocation of retros, Household had improperly used the traditional method instead of the so-called "share formula" provided in the purchase agreement; that the allocation of debits and credits should be computed for each policy individually; and, finally, that Household did not owe Nippon attorneys' fees under the indemnification clause.

In March 1999, the district court made additional pertinent rulings. Most important, it decided that under the terms of the purchase agreement, Nippon had an obligation to pay retro debits but did not have a right to receive retro credits which instead accrued to Household's benefit. The court also rejected Nippon's claim for prejudgment interest on the $1.6 million restitution of deferred premiums that Household had mistakenly collected from Nippon. The court also declined to reconsider earlier rulings. A final judgment was entered after Liberty and Household settled the disputes between them.

Nippon has now appealed, making three claims: first, that as to retros, it is entitled as to each policy to offset debits against credits and also to retain any net credits; second, that it is entitled to prejudgment interest on the $1.6 million in deferred premiums restored to it; and third, that it is entitled to

-7-

attorneys' fees and other litigation expenses.  Our review is <u>de novo</u> as to questions of law and for clear error as to fact-findings by the district court.  Fed. R. Civ. P. 52; <u>Principal Mut. Life Ins. Co.</u> v. <u>Racal-Datacom, Inc.</u>, 233 F.3d 1, 3 (1st Cir. 2000).

<u>Credits and Debits</u>.  The trickiest question is the offset of credits against debits and retention of net credits.  Recall that an individual policy (say, automobile coverage for accidents occurring in 1984) will likely result in a series of retro adjustments in each later year as claims are made; for one later year, this might be a debit obligating Household or Thermos to pay Liberty a further premium adjustment and for the next year it might be a credit resulting in a refund by Liberty.  Nippon concedes that it is responsible under the purchase agreement for debits, but it wants to be able, as to any policy, to reduce debits owed to Liberty by credits from years when Liberty must make refunds (and also to retain any net credits).

The district court decided this issue in favor of Household.  It pointed out that in section 5.10(b), the purchase agreement provides that Nippon would pay outright (or reimburse Household) its defined "share" of "any self retention or deductible (including . . . any retrospectively-rated premium adjustments [<u>i.e.</u>, retros])," subject to a proviso that Nippon is obligated to pay to Household "no more than the self retention or deductible amounts" actually paid by Household to Liberty.  The court pointed

out that Nippon is the only one required to "pay or bear" and that nothing in this agreement, or elsewhere, said that retro credits should accrue to Nippon.

On this issue the purchase agreement is hardly a model of lucidity--the price of drafting a complex document over a weekend--but we broaden the focus and come to a different result. The language stressed by the district court comes from only one part of the section governing insurance. Even taken by itself, subsection (b) of section 5.10 inflicts on Nippon Sanso K.K. liability for "any retrospectively-rated premium adjustments" attributable to Thermos; and because such adjustments can include credits as well as debits, this language does not clearly indicate that Nippon is liable for debits but Household keeps all the credits. One could equally well urge that Nippon is responsible for any net obligation to Liberty under each policy.

Recognizing that the contract does not deal expressly with "credits" (or "debits" for that matter), our obligation is to take the relevant insurance provisions as a whole and give them a sensible reading in light of their language and the discerned purpose of the parties. See, e.g., Shelton v. Andres, 478 N.E.2d 311, 314 (Ill. 1985); 2 Farnsworth, Farnsworth on Contracts, § 7.10, at 276-77 (2d ed. 1998). Of course, if there were precise contract language on point, that would govern; but, failing that and also lacking here any extrinsic evidence that the parties

explicitly discussed the debit/credit issue and arrived at a solution, we must interpolate. Whether the result is an actual rendition of what the parties agreed or what reasonable parties in that position would have intended is often a blurred distinction. See id. §§ 7.9, 7.11, at 273-74, 280.

Here, subsection (b) is part of a broader whole--section 5.10--intended to address a peculiar problem posed by a number of elements: that Household's individual policies each covered both Thermos and other companies that were retained or otherwise disposed of by Household; that claimants could be litigating or even bringing new claims after the sale but for pre-sale events; and that retrospective adjustments of the premiums for pre-sale policy years could and probably would occur after the sale. Thus, the simple carrying over of existing insurer-insured relations that would exist where a sold or spun-off company simply carried its own insurance and took the policy with it could not work in this instance.

The purchase agreement starts in section 5.10(a) with the premise that the policies for pre-sale years were contracts between Liberty and Household and "have not been assigned to" Nippon Sanso K.K. or Thermos. See also purchase agreement § 5.10(d). Then, the same subsection provides in substance that Household will assist Nippon in "pursuing any rights" that Thermos might have under the policies covering claims pertaining to Thermos' pre-sale

operations, including the right (so far as the insurer permitted) to claim directly against the insurer and "to receive directly any recoveries thereunder." Subsection (c) provides inter alia that if instead Household gets the money, it shall pay the money over to Nippon.

Of course, in exchange, Household understandably wanted Nippon to be responsible for additional payments required for coverage as to Thermos since Nippon was receiving the benefit of the protection as to Thermos. Thus, having given Nippon rights under subsections (a), (c), and (d), subsection (b) of the same section is devoted to protecting Household by providing that Nippon will reimburse Household for its expenses in relation to the insurance coverage for Thermos and that Nippon will bear or reimburse Household for Thermos' "share" of retro adjustments. There is more detail but this is the thrust of the provision.[3]

Against this background, we hold that the purchase agreement gives Nippon, in relation to the coverage Liberty provided Thermos, the benefit of retro credits as well as the liability for retro debits under each individual policy. Although subsection (b) is phrased to provide protection for Household, it

---

[3]The final proviso of section 5.10(b), earlier mentioned, makes clear that Nippon's liability to Household for "self retention" amounts—e.g., retro debits owed to Liberty—will be "no more than" Household's payments to Liberty for Thermos coverage. Nippon relies upon this language to show that debits should be reduced by credits, but that argument is not necessary to our own analysis.

is part of the larger scheme of section 5.10 that aims to make Nippon bear the costs and get the benefits of the policies with respect to Thermos. Those benefits include retro credits as well as the insurer's reimbursements for third-party claims exceeding deductibles; this might even be implied by the reference in subsection (a) to Thermos' "rights" under the policies.

Further, as to every policy each later year will generate a separate credit or debit (or occasionally zero) depending on how far new claims experience indicates that the initial premium overestimated (for credits) or underestimated (for debits) the risk of claims. Each retro, whether paid to or received from Liberty, is only a further refinement designed to make the ultimate premium for the policy year more closely match the ultimate claims experience. To impose liability on Nippon for debits but to say that Household keeps the credits is an improbable arrangement and invites bizarre results.[4]

Given the structure of the insurance provisions, one might think that Nippon should also bear the cost of the initial premium, an impression reinforced (wrongly, for deferral is merely

_____

[4]The easiest example is to imagine two different "experience" years, say, 1987 and 1988, pertaining to the 1984 automobile policy. On Household's reading, it would keep a credit of $10 generated in 1987 and Nippon would pay a debit of $10 generated in 1988; and yet if the underlying claims had come in a different order, so that each year alone generated a zero adjustment, neither company would pay (or receive refunds). In both examples, of course, Liberty's position remains the same.

a financing mechanism) by the fact that the initial premium is paid over five years. Having chosen not to appeal the district court's contrary ruling, Household cannot now dispute that it, rather than Nippon, is responsible for the initial premium. Rather, Household argues in the converse that, because it bears the initial premium, it should also get the benefit of retro credits, which could be viewed as a partial return of the premium that it has already paid or is paying.

To this there are two answers. The first is that Household itself <u>already</u> benefitted from the initial premium, because that premium allowed Thermos to be covered in the years when it was still owned by Household. Second, while Nippon also benefits from the initial premium because these are occurrence-based policies, whatever implicit obligation (based on the logic of section 5.10) might otherwise be imputed to Nippon to share in the initial premium is explicitly negated elsewhere: in the separate warranty provision of the contract, Household itself warranted (inaccurately) that the deferred premiums had been paid in full. Purchase agreement § 3.12. Thus any benefit Nippon got from the discharge of the deferred premiums was bargained for and presumably reflected in the purchase price.

As it happens, although we do not rely upon this fact, Household's initial practice after the sale tends to bear out our understanding. While Household continued to act as middleman, it

-13-

charged Thermos for any deferred premiums that Household had paid in respect of Thermos' coverage (apparently unaware of its warranty), but it also gave Nippon retro credits. When tripped up as to the former error by discovery of the warranty, Household sought to recoup by claiming entitlement to the credits. But the credits, in our view, are properly paired with the debits under the insurance provision of the contract, and Household's obligation as to deferred premiums stems from its own explicit warranty.

Prejudgment Interest. As already noted, Household had billed Nippon for deferred portions of the initial premium due to Liberty. Nippon has now been awarded judgment against Household for about $1.6 million in these deferred premiums. In the district court, Household argued that, at the time of the reorganization and before the sale, Thermos had assumed liability for the deferred payments under the pertinent A&A agreement. In its 1997 decision, the district court said that the A&A agreement was silent and, noting that the purchase agreement warranted that all premiums had been paid as of the date of closing, ruled that this obligation remained with Household.

The merits of the ruling are not before us because Household has not appealed it. Instead, it is Nippon who claims that the district court erred in failing also to award prejudgment interest on the refunded premiums, which interest (Nippon says) now amounts to approximately $1 million. Nippon relies primarily upon

-14-

the indemnification provision of the purchase agreement insuring Nippon against all losses due to Household's breach of the purchase agreement. Nippon regards the time-value of the $1.6 million as a loss inflicted by Household's wrongful billing of the $1.6 million to Nippon, and section 1.11A of the purchase agreement defines loss to include lost "interest."

The difficulty with Nippon's indemnification theory is that the purchase agreement contains a non-survival clause with respect to warranties, which clause provides that the warranties terminated as of the closing and "cease[ed] to be of further force and effect"--save warranties specifically enumerated. Purchase agreement § 9.1. The "premiums paid" warranty was not among those preserved as a basis for post-closing liability. To treat the improper billing (post-closing) by Household of deferred premiums as itself a breach of the warranty and as triggering indemnification appears to contradict the no-survival provision.[5] Moreover, the indemnification provision upon which Nippon relies lists the warranties for which indemnification is available, and again the "premiums paid" warranty is not among the ones named as eligible. Purchase agreement §§ 3.12, 9.2(a)(ii).

_____

[5]This does not mean that the district court was wrong in considering the warranty when it concluded that the purchase agreement did not transfer to Nippon Household's pre-existing responsibility to pay deferred premiums. Our own intuition is the same as the district court's, namely, that the warranty could not be a basis for recovery but could still cast light on what other contractual provisions did or did not do.

Nippon argues that the charging of deferred premiums also violated a different provision of the purchase agreement, namely, section 5.10(b) which obligates Household to charge Nippon its share of the retros and--implicitly, according to Nippon--nothing more. We agree with the district court that the retro share formula simply "does not apply" to responsibility for initial premiums, whether deferred or otherwise. Indeed, Nippon's opening brief said that Household's improper charging of deferred premiums is "a violation of the contract that had <u>nothing</u> to do with retro share calculations." In any event, Nippon's argument, not made in the opening brief but only in the reply, is waived. <u>Keeler</u> v. <u>Putnam Fiduciary Trust Co.</u>, 238 F.3d 5, 10 (1st Cir. 2001).

Once past the indemnification clause, whether prejudgment interest should be awarded is, under Illinois law, left to the discretion of the judge. <u>In re Wernick</u>, 535 N.E.2d 876, 887-89 (Ill. 1989). The underlying award of $1.6 million rested upon a restitution theory--that the liability for deferred premiums was that of Household, had not been shifted from it, and had been mistakenly billed to Nippon--but the district court also found that this was not a bad faith error nor one equitably warranting prejudgment interest.

In the district court, Nippon urged that it was entitled to prejudgment interest on equitable grounds as well as under the indemnification clause. In this court, Nippon has seemingly

-16-

abandoned any challenge to the district court's rejection of this equitable argument. At least it fails to develop it in any serious way, which leads to the same result. See Prisma Zona Exploratoria de Puerto Rico, Inc. v. Calderon, 310 F.3d 1, 8 (1st Cir. 2002).

Attorneys' Fees & Litigation Expenses. Nippon also sought attorneys' fees and litigation expenses in the district court. Attorneys' fees and costs are included as compensable loss under the purchase agreement's indemnification provision so far as they are "based upon, arising out of, or resulting from . . . any failure of [Household] to perform in all material respects [its] obligations." Purchase agreement § 9.2; see also id. § 1.11A. We have already noted that the billing of the deferred premiums, although mistaken and requiring restitution, was not a breach of the purchase agreement except as to the expired warranty; and thus Nippon cannot be reimbursed for attorneys' fees for that breach.

However, Nippon also seeks attorneys' fees for a different breach of the agreement: Household's breach of the provision governing allocation of retros as between Nippon and other business covered by the same policies. The district court ruled that there was such a breach by Household because, as already noted, it made allocations of retros based on its traditional method. In doing so, Household ignored an explicit provision of the agreement that specified the so-called "share formula" for allocating retros. Purchase agreement § 5.10(b). The details of

-17-

the dispute need not be described because Household has not appealed from the district court's finding of violation; but Household does defend against Nippon's claim that Nippon's attorneys' fees should be paid.

The district court refused to award Nippon attorneys' fees, conceding that Household had breached the allocation provision but saying that "no damages [in the form of attorney's fees] resulted from this breach."  The district court's reasoning was as follows:

> However, Nippon Sanso and Thermos are not entitled to litigation costs and expenses under section 9.2 because their losses did not result from [Household's] breach.  Even if [Household] had attempted to calculate Nippon Sanso's share under section 5.10(b) from the outset, this litigation would have proceeded in the same way with the same expenses.  The primary focus of phase I of this case has been the definition of the share percentage and its application, as to which the parties simply had very different interpretations. Therefore, [Household's] breach of section 5.10 did not cause this litigation nor its cost.

This critique does not fully answer Nippon's claim. Litigation may have been inevitable because the parties disagreed about varying provisions and could not settle the case; but Household was responsible for conduct violating the share allocation formula and the litigation embraced that issue.  To the extent that Nippon incurred attorneys' fees to resolve the share allocation issue, there is no obvious reason why they should not

-18-

constitute losses due to Household's breach, whether the breach and the litigation were inevitable or not. The indemnification clause does <u>not</u> make Household's bad faith or equities in favor of Nippon a condition of Nippon's recovery.

Of course, this does not make Household liable for Nippon's litigation expenses in resolving other disputed issues and the allocation error may have been a very small part of litigation that has spanned over ten years. Household argues that early on it conceded its breach in using the traditional method, suggesting that Nippon's expenses on this issue were slight or unnecessary; but Nippon points to some evidence to the contrary and the district court made no findings on this point. On remand, the district court must decide what portion, if any, of Nippon's reasonable litigation costs as to the allocation issue is over and above what it would have incurred anyway because of disputes on other issues.

Further, Nippon argues that the dispute was not limited to the question of whether the traditional method or the share formula of allocation should be used; Nippon says that litigation was required to settle a dispute concerning, <u>inter alia</u>, the proper numerator to be used in implementing the share formula. That dispute was itself settled by the district court in Nippon's favor, so Nippon claims that its attorneys' fees as to this issue are also covered by the indemnification clause.

Since Household apparently did not use the share formula at all, arguably this interpretive dispute, even though entailing litigation, may not be a breach of the purchase agreement warranting indemnification; yet on the other hand if Household's interpretation of the formula in the litigation below did not conform to the requirements of the contract, then perhaps that misinterpretation would have been breach and indemnification would be due. But these wrinkles are for the parties and the district court on remand.

This case is about money, but only money, and should have been settled (each party being right on some part of the case) early in the district court process. The cost of not settling, which both sides now bear, is attorneys' fees incurred over many years--most of them beyond any claim of reimbursement--and the continuing distraction of busy executives. We have been forced to remand on one narrow issue which in the nature of things is not susceptible to a perfect answer. Before more of the district court's time is consumed in this endeavor, counsel ought to call their principals' attention to the cost and settle what remains.

The judgment of the district court is affirmed as to the denial of prejudgment interest and the denial of attorneys' fees attributable to Household's mistaken billing of deferred premiums, reversed as to the refusal to assign retro credits to Nippon although without disturbing the prior ruling that the allocation of

retros should be calculated separately as to each policy, <u>vacated</u> as to the denial of attorneys' fees and litigation expenses on the share allocation issue, and <u>remanded</u> for proceedings consistent with this decision.

<u>It is so ordered</u>.

Section 1.11A. "Loss" shall mean any loss, damage, liability cost and expense, including, without limitation, any interest, fine, court cost, reasonable investigation cost, penalty and attorneys' and expert witnesses' fees, disbursements and expenses, subtracting from any Loss any insurance proceeds actually received by any person or entity incurring a Loss.

Section 3.12. Insurance. Schedule 3.12 hereto sets forth, as of the date hereof, a list of all currently effective insurance policies relating to the Leisure Products and Houseware Business issued in favor of Household, Thermos UK, Thermos Pty., CTP, Thermos and/or TDR, the identity of the respective insurance carriers, the respective policy periods and the respective limits and retentions. All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and no notice of cancellation or termination has been received with respect to any such policy. Such policies are sufficient for compliance with all requirements of law and with all agreements to which Thermos UK, Thermos Pty., CTP, Thermos or TDR is a party; are valid, outstanding and enforceable policies; and will remain in full force and effect through the respective dates set forth in Schedule 3.12 without the payment of additional premiums. Schedule 3.12 identifies all risks which Thermos UK, CTP, Thermos Pty. or TDR,

each of their respective Boards of Directors or officers, have designated as being self-insured and the Sellers represent and warrant that the reserves set aside for such risks are adequate to pay all self-insured claims or amounts that come due under the policies referred to in Section 5.10 in respect of claims and estimated non-claims expenses attributed to the Leisure Products and Houseware Business. None of Household, Thermos UK, CTP, Thermos, Thermos Pty., or TDR have been refused any insurance with respect to its assets or operations, nor has its coverage been limited, by any insurance carrier to which it has applied for any such insurance or with which it has carried insurance since January 1, 1986.

\* \* \*

Section 5.10. Insurance. (a) From and after the Closing, Household shall use reasonable efforts (which shall not require acceptance of adverse changes in its existing insurance policies), subject to the terms of the Household Insurance Policies (as hereinafter defined), to assist Buyer, CTP, Thermos, Thermos Pty. and TDR in pursuing any rights Buyer, CTP, Thermos, Thermos Pty., and TDR may have under any insurance policies maintained at any time prior to the Closing by Household and its predecessors and its affiliates and their predecessors (collectively, the "Household Insurance Policies"), covering any loss, liability, claim, damage or expense relating to the assets,

business, operations, conduct, products and employees (including former employees) of Thermos UK, CTP, Thermos, Thermos Pty., TDR and each of their respective predecessors that relates to or arises out of occurrences prior to the Closing (an "Insurance Claim"). Household agrees to use reasonable efforts so that Buyer, CTP, Thermos, Thermos Pty. and TDR shall have the right, power and authority, subject to any required consent of the carriers under the Household Insurance Policies, in the name of Household or any of its affiliates to make directly any Insurance Claims under the Household Insurance Policies and to receive directly recoveries thereunder.  Buyer and Sellers recognize that the Household Insurance Policies have not been assigned to Buyer, Thermos, Thermos Pty., CTP or TDR.

(b) Buyer agrees to reimburse, indemnify and hold Household and its affiliates harmless for reasonable costs and expenses incurred after the Closing Date to carry out any obligations pursuant to this Section 5.10 or as a result of Insurance Claims being made.  Notwithstanding any prior agreement between Household and Thermos UK, CTP, Thermos Pty., Thermos or TDR to the contrary, Buyer will pay and bear (or if paid by Household, reimburse, indemnify and hold Household and its affiliates harmless for) all amounts relating to its "Share" (as defined below) of any self retention or deductible (including without limitation, any retrospectively-rated premium adjustments or retentions) and any

-24-

gaps in or limits on coverage applicable to an Insurance Claim asserted at any time in effect at such time with respect to the applicable Household Insurance Policy.  In the event that any legal action, arbitration, negotiation or other proceedings are required for CTP, Thermos, Thermos Pty. or TDR to assert coverage against any insurer or to perfect its Insurance Claim, (i) Buyer shall, to the extent possible, do so or (ii) if Buyer is not permitted to assert coverage or perfect an Insurance Claim, Household shall do so and, in either event, Buyer shall hold harmless and indemnify Household and its affiliates for any costs and expenses that they might incur because of such action.  The Buyer's "Share" of any self retention or deductible shall be determined reasonably by Household to be that percentage of the self retention or deductible under any Household Insurance Policy for the period covered by such Policy determined by dividing the aggregate amount of Insurance Claims made by Buyer and Thermos with respect to such Policy and such period, by the aggregate amount of Insurance Claims made by all insureds under such Policy with respect to such Policy and such period, calculated at the time each Insurance Claim is made by Buyer or Thermos; provided that Buyer shall be obligated to pay to Household no more than the self retention or deductible amounts actually paid by it in respect of Insurance Claims made by Buyer or Thermos.

(c)    Household shall use reasonable efforts (i) to cooperate fully and to cause its affiliates to cooperate fully with Buyer, CTP, Thermos, TDR and Thermos Pty. in submitting good faith Insurance Claims on behalf of Buyer, CTP, Thermos, TDR and Thermos Pty. under the Household Insurance Policies, (ii) to execute any and all agreements and other documents which are reasonably necessary or appropriate in connection with any of the foregoing, including maintaining and reporting quarterly reductions in the amount of the aggregate limits, if applicable, under such insurance policies and assigning to Buyer, CTP, Thermos, TDR and Thermos Pty. any right to receive payments in respect of Insurance Claims under all such policies in the event consent to such assignment can be or is obtained from any insurer (if applicable) and (iii) to pay promptly over to Buyer any and all amounts received by Household or its affiliates under such policies with respect to Insurance Claims.

(d)    Household and its affiliates shall retain custody of the Household Insurance Policies and any and all service contracts, claim settlements and all other insurance records relating thereto and Buyer, CTP, Thermos, Thermos Pty. and TDR shall have access to and the right to make copies of all such documents and records upon reasonable request to Household or its affiliates.  If Household desires to destroy any such policies or records it shall first notify Buyer who shall have the right to cause the same to be

delivered promptly to it upon reimbursing Household for reasonable expenses incurred in connection therewith.

* * *

Section 9.1.    Survival Periods. . . .     All representations and warranties of the parties contained in this Agreement or in any Schedule hereto, or any certificate, document or other instrument delivered in connection herewith shall terminate and cease to be of further force and effect as of the Closing, except that each representation and warranty set forth in Section 3.1; Section 3.18 [with exceptions]; Section 3.19 [with exceptions]; Section 3.20; and Section 3.22, shall survive the Closing until the third anniversary of the Closing Date, and the representations and warranties contained in or made pursuant to Section 3.16, and the obligations of Seller and Buyer to indemnify each other pursuant to Section 5.12, shall survive the Closing Date and continue at all times thereafter until the expiration of the applicable statute of limitations with respect thereto.

* * *

Section 9.2.    Agreement to Indemnify. (a)  Upon the terms and subject to the conditions of this Article IX, Sellers hereby agree to indemnify, defend and hold harmless Buyer and its officers, directors and subsidiaries (collectively, the "Buyer Group"), from and against all Losses and Claims based upon, arising out of, or resulting from (i) any failure of the Sellers to perform

-27-

in all material respects their obligations under this Agreement, (ii) any breach by Sellers of any representation or warranty set forth in Section 3.1; Section 3.16; Section 3.18 [with exceptions]; Section 3.19 [with exceptions]; Section 3.20; and Section 3.22, and (iii) any Excluded Liability.