# United States Court of Appeals

## For the First Circuit

No. 03-1586

COADY CORP., d/b/a 495 TOYOTA,

Plaintiff, Appellant,

v.

TOYOTA MOTOR DISTRIBUTORS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Chief Judge,

Lourie[*] and Lynch, Circuit Judges.

Evan T. Lawson with whom J. Mark Dickison, Robert J. Roughsedge, Michael Williams, Nicole L. Johnson and Lawson & Weitzen, LLP were on brief for appellant.
Daniel L. Goldberg with whom David Yamin, Justin M. O'Sullivan and Bingham McCutchen LLP were on brief for appellee.

March 18, 2004

---

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN**, **Chief Judge**.  This is an appeal from the judgment of the district court rejecting claims by Coady Corporation ("Coady") against Toyota Motor Distributors, Inc. ("Toyota"). Toyota is the regional arm of Toyota Motor Sales USA, Inc., a national distributor of Toyota Motor Vehicles; Coady, doing business as 495 Toyota and owned by Kevin Coady, is a Toyota dealer based in Milford, Massachusetts.  Much of the dispute revolves around Coady's access to new vehicles from Toyota.

Toyota, like other major distributors, supplies a large number of dealers; in its "Boston region," which includes most of New England, there are about 71 dealerships, each with its own primary market area.  However, other dealers are free to compete with Coady, and Coady with them.  Coady's nearest competitor is Bernardi Toyota, which is based closer to the Boston metropolitan area.  Boch Toyota is another competitor, and its primary market area adjoins Coady's.

Coady has been a Toyota dealer since 1977 and, for most of the period, operated under the standard Toyota dealer agreement. Among other things, the agreement obligates Toyota to explain its vehicle distribution methods to dealers, to use its best efforts so dealers can meet their own obligations under the agreement, and to allocate vehicles in a fair and equitable manner as determined by Toyota.  Statutes impose additional and more detailed obligations on Toyota, as we discuss below.

Until February 1999, Coady mostly operated under six-year agreements, and, for part of its tenure was not apparently a successful dealer, which Coady says resulted from his unfair treatment by Toyota. When the last of these six-year agreements expired in 1999, Toyota--unhappy with Coady's performance and acting against a background of quarrels between Coady and local Toyota managers--offered Coady only a two-year extension. The proposed new agreement contained a non-standard provision requiring Coady to maintain 100 percent or better "retail sales efficiency"-- a measurement used by Toyota for which 100 percent is supposed to represent average dealer sales performance in the region.

When the 1999 agreement expired in 2001, Toyota again offered a new two-year agreement, even though Coady's efficiency rating had fallen to under 40 percent. The proposed new agreement retained the unenforced 100 percent sales efficiency requirement. It also proposed new requirements that Coady maintain a debt to equity ratio of no more than 1:1 and renovate the interior of its dealership. Coady declined to sign the new agreement and has instead operated under month-to-month extensions of its franchise.

In the meantime, Coady filed the present lawsuit in November 1997, against Toyota asserting a host of claims under federal and state law, including federal antitrust claims, 15 U.S.C. § 1 (2000), claims under the federal Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221-1225 (2000), and claims under the

so-called Massachusetts "Dealer's Bill of Rights", Mass. Gen. Laws ch. 93B ("chapter 93B").

In due course, the district court dismissed certain of the claims, allowed Coady to expand its complaint and then denied cross-motions for summary judgment. Beginning on January 13, 2003, the district court held a jury-waived trial, comprising eight days of testimony. On April 14, 2003, the district court filed a detailed decision over 50 pages rejecting on the merits all of the Coady claims, and Coady now appeals.

On this appeal, Coady's main claims are directed at a set of practices or occurrences that, in Coady's view, represent violations of chapter 93B as it stood prior to recent amendments.[1] Coady also presses claims for breach of contract. Our review of the district court's decision is for clear error as to its findings of fact and <u>de novo</u> as to questions of law, Fed. R. Civ. P. 52; <u>Liberty Mut. Ins. Co.</u> v. <u>Nippon Sanso K.K.</u>, 331 F.3d 153, 158 (1st Cir. 2003); as to questions of characterization, the standard is more complex. <u>See</u> note 3 below.

As its primary method of allocating vehicles--the so-called "balanced day's supply method"--Toyota allocates vehicles to dealers once every two weeks (usually at the beginning and middle of the month); the method uses a formula that assigns available

---

[1]Chapter 93B was amended in 2002, <u>see</u> 2002 Mass. Legis. Serv. 222 (West), but both sides agreed that the pre-amendment version controls and our citations throughout are to that version.

vehicles in the region based upon each dealer's inventory and recent sales volume. The method does not simply replace vehicles sold on a one-to-one basis but rewards past sales performance, so that successful dealers do better than unsuccessful ones.

In the first instance, the system relies upon self reporting. For each sale, the dealer inputs the sale information--including the vehicle identification number and the name and address of the customer--into a computer network that informs Toyota of the sale. When supplies are tight and stock can be easily sold, as was true for much of the 1990s, there is some incentive for dealers to misreport in the hope of increasing new inventory.

Coady did offer evidence that its competitors had misreported sales and Toyota was aware of the problem although the precise effect on Coady is uncertain. How many inaccurate reports are required to affect the allocation and how much of an effect inaccurate reports produce is hard to summarize. Some evidence at trial suggested that for Coady to be deprived of a single Toyota Camry it would take 100 inaccurately reported Camry sales by other dealers in the region during a two-week period.

Toyota monitors the accuracy of the reporting by comparing the sales reports it receives from dealers with the registration data provided by the R.L. Polk Company--apparently a widely used automotive information and statistical reporting

service.  When the two reports do not match for a feature such as the customer's name or address Toyota labels this a "no-match". No-matches can reflect either innocent reporting errors or intentional false reporting by the dealer.  All dealers, including Coady, incur no-matches from time to time.  Coady's position at trial was that deliberately false reporting was widespread and known to Toyota.

At trial, Coady claimed that Toyota's tolerance of false reporting by its competitors violated chapter 93B.  The statute makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices,"  Mass. Gen. Laws. ch. 93B, § 3(a)(2001), and then lists specific forbidden practices.  See Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc., 381 N.E.2d 908, 911-12 (Mass. 1978).  Pertinently, section 4(3)(a) makes it a violation for a distributor

> to adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers which is arbitrary or unfair or to modify an existing plan so as to cause the same to be arbitrary or unfair.

Mass. Gen. Laws. ch. 93B, § 4(3)(a) (2001) (emphasis added).

Relying on dictionary definitions and case law relating to a New Hampshire statute similar to chapter 93B, see N.H. Auto. Dealers Ass'n, Inc. v. Gen. Motors Corp., 620 F. Supp. 1150, 1157 n.20 (D.N.H. 1985), aff'd in part, vacated in part, 801 F.2d 528 (1st Cir. 1986), the district court held that in this context

"arbitrary" meant a regime that is "<u>not</u> based in reason and is implemented in bad faith because of a dishonest purpose."  As for "unfair," the court relied again on the dictionary and a Massachusetts case, <u>Levings</u> v. <u>Forbes & Wallace, Inc.</u>, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979)(addressing Mass. Gen. Laws ch. 93A, § 11 (1978)), to limit the term to an allocation plan "based on inequity, dishonesty and fraud".

Applying this definition to allocation systems, the district court held that:

> In the absence of any claim that Toyota itself "cut off" Coady's supply of vehicles, in order to show that Toyota has implemented an "unfair or arbitrary" allocation system for the distribution of motor vehicles to Coady through periodic allocations, Coady must prove, based on "all pertinent circumstances," that Toyota affirmatively facilitated or encouraged fraudulent sales reporting by dealers other than Coady.  It is insufficient for Coady to prove that dealers other than Coady inaccurately reported sales because, to be "arbitrary or unfair," such inaccurate sales reporting must be shown to be fraudulent or dishonest.  Nor is it sufficient to prove that Toyota knew about fraudulent sales reporting by its dealers but failed to prevent it.

We think that the district court has made the legal standard too demanding.  Based on ordinary usage, conduct can be "arbitrary" and perhaps even "unfair" without subjective bad faith;[2] agency action taken without any whiff of dishonesty or

_____

[2]Dictionary definitions of "arbitrary" do sometimes include language referring to "bad faith" or "dishonest purpose", usually

-7-

fraud is commonly so characterized, and overturned, under an arbitrariness standard.[3] True, as the district court said, chapter 93B finds its roots in a concern about "oppressive power" of makers and distributors, <u>Beard Motors, Inc.</u> v. <u>Toyota Motor Distribs., Inc.</u>, 480 N.E.2d 303, 306 (Mass. 1985); but such power can be carelessly as well as wilfully deployed.

Admittedly, the district court's reading of the arbitrariness standard is supported by a statement of a sister federal court in New Hampshire construing the same term ("arbitrary") in that state's automobile-dealer statute. Relying on <u>Black's Law Dictionary</u>, that case held that "arbitrary" was synonymous with "bad faith or failure to exercise honest judgment." <u>N.H. Auto. Dealers Ass'n, Inc.</u>, 620 F. Supp. at 1157 n.20. But this 20-year old definition was too narrow even then and was pure dictum because the district court found that the challenged conduct

_____

accompanying alternative definitions that omit the subjective element and refer to actions performed in an "unreasonable manner", "capriciously" or without support. <u>Black's Law Dictionary</u> 104 (6th ed. 1990); <u>Random House Webster's College Dictionary</u> 70 (1991).

[3]<u>See</u> 5 U.S.C. § 706(2)(A) (2000); <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc.</u> v. <u>State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)(Agency action is arbitrary under the Administrative Procedure Act "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

in that case was based on "reasonable business practices"--the same test that we now endorse.  Id. at 1157.

Nevertheless, chapter 93B (as we read it) does not demand perfection in allocation or warrant a substitution of judicial for business judgment.  A distributor acting honestly is entitled to latitude in making commercial judgments; and chapter 93B was not meant to insulate dealers from the ordinary flux of pressure and striving that is part of a free economy.  Am. Honda Motor Co., Inc. v. Bernardi's, Inc., 735 N.E.2d 348, 354 (Mass. 2000).  In this context, it is only the egregious decision that should be labeled "arbitrary" or "unfair."  Cf. Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc., 976 F.2d 58, 63 (1st Cir. 1992).

To us, this means that "[a]n allocation system is not unreasonable simply because it is possible to subvert it, as long as reasonable steps are taken to prevent and detect such subversion."  Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co., Inc., 773 F.2d 1193, 1206 (11th Cir. 1985), cert. denied, 475 U.S. 1122 (1986).  And "reasonable" does not mean foolproof; there are costs to every business endeavor, including enforcement, which are ultimately borne by those who purchase the product.

Here, the district court found as fact that Toyota had sought to combat dishonest reporting: in addition to making false reporting a ground for termination and offering periodic education on proper reporting, Toyota conducted ground stock audits to

reverse reported sales of vehicles found on lots; adopted a policy to decrease allocations to dealers found to have "no match" rates over a fixed percentage; and began to decrease district manager bonuses for excessive no-match rates in their districts (although Coady says that this was delayed for two years because of computer problems).

These findings in turn led the district court to conclude that "Toyota took reasonable steps at all relevant times to ensure that sales were reported accurately and to reverse those sales that were not . . . [and so] ensured that . . . periodic allocations [to the Boston region] were neither arbitrary nor unfair." This determination amounts, in substance, to an alternative ruling by the district court that even if reasonable efforts by Toyota to check fraudulent reporting were required, Toyota made those efforts. And, this alternative view--being based on a proper standard--justifies affirmance, assuming that the finding of reasonableness is sound.

In substance, Coady's claim is that Toyota long knew of the problem of false reporting, acted too casually to bring it under control, and even now does not have anything like a foolproof system. Coady's evidence describes flaws; Toyota responds by pointing to its own efforts to monitor and control the problem. Except by describing each incident and measure in the very extensive record, there is no way to summarize the ebb and flow.

In the absence of some sharper standard, the district court had to make an assessment as to whether Toyota had acted unreasonably.

Applying abstract labels to settled facts is, strictly speaking, a prescriptive and therefore a legal judgment; but where the outcome is debatable, some (and often much) deference is normally afforded to the factfinder's evaluation, because the one who heard the evidence is closer to the scene and better steeped in the nuances.[4] Affording such deference to the district court's ultimate conclusion and considering the latitude the statute permits to business managers, we cannot say that the district judge was wrong.

A second set of chapter 93B claims by Coady, relating to allocation, concerns "turndowns." Dealers including Coady do not accept every vehicle earned in a periodic allocation, and each region has its own method of reallocating such rejected vehicles. In the Boston region, turndowns are first offered to dealers within the same district where they were originally assigned, and if

---

[4]In re Spadoni, 316 F.3d 56, 58 n.1 (1st Cir. 2003); Jackson v. United States, 156 F.3d 230, 232 (1st Cir. 1998); In re Extradition of Howard, 996 F.2d 1320, 1328 (1st Cir. 1993) (degree-of-deference continuum). There are exceptions to the affording of deference--none here relevant--based on history (e.g., contract interpretation, see Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000)) and policy (e.g., Fourth Amendment, see Ornelas v. United States, 517 U.S. 690, 697-98 (1996)).

unclaimed they are offered to all dealers in the region as "port stock" (a subject to which we will return).

Coady's first claim regarding the turndowns was that this system of allocation is "arbitrary or unfair" because Coady's two main competitors, Bernardi and Boch, are part of a contiguous but separate district with more turndowns, so they have access to turndowns that Coady does not. The district court rejected this contention, finding that the current method of allocating turndowns

> is employed because it allows for rapid, low-cost distribution of turndowns based on an individualized assessment of each dealer's needs. It is deemed more efficient to distribute turndowns in this manner rather than to group all Region-wide turndowns together and distribute them through a second [balanced day's supply method] allocation as was done between 1989 and 1991.

The choice not to allocate turndowns region-wide had a plausible business rationale; indeed, Toyota had experimented with region-wide allocation of turndowns between 1989 and 1991 before changing to the current system. Every system has pluses and minuses, and a fair allocation system does not mean one without wrinkles. Nothing in Coady's showing on this issue causes us to second guess the district court's assessment.

Coady's second turndown complaint stems from the failure of Toyota to have a written policy on turndowns. This is not itself arbitrary or unfair but, as the district court noted, "the turndown allocation system depends, to some extent, upon each

district manager's discretion in offering vehicles to the dealers," and the court found that this discretion had been abused on at least one occasion when then district manager Andrew Brody reduced Coady's access to desirable turndowns due to some bad blood between Brody and Coady. However, an occasional abuse does not automatically require a more formal or rigid policy. As to the incident itself, the district court found that Coady had not offered evidence of specific damages arising from the incident.[5]

The vehicles rejected in the turndown process fall into what is known as "port stock"--vehicles available to all dealers in the region. Toyota informs dealers about the vehicles it has in port stock by fax and dealers may claim those vehicles on a "first come, first served" basis. Coady says that Toyota was arbitrary because it sent such notices by fax and not e-mail, listing Coady last on the fax list. Coady does not quantify the effect and, at least in these circumstances, chapter 93B does not require this kind of micro-management by courts.

Next, in a further attack on Toyota's fairness in allocation, Coady complains about (again relying upon chapter 93B)

_____

[5]Coady did offer expert damage evidence based primarily on a study of how the balanced day's supply regime would, if unflawed by dishonest reporting, have given Coady more vehicles; but, at least on appeal, Coady points to no evidence as to damages from individual events such as dispute with Brody. The district court did not credit Coady's main damage evidence but, as Coady itself recognizes, the court's main holding on the fraudulent reporting issue rested on lack of a violation.

-13-

Toyota's "market representation vehicle support program." Under this program, a dealer can earn extra vehicles by becoming an exclusive Toyota dealership, by installing qualifying branding signs or by making improvements in new or modernized facility improvements. To qualify for the program, dealers must document their expenditures.

Coady says that Toyota failed to provide thirty vehicles under the program after Coady spent $200,000 on qualifying improvements to its facility in 1994, even though Toyota awarded more than 900 vehicles to Bernardi for qualified improvements. The key difference was that Coady, unlike Bernardi, failed to provide receipts to Toyota to verify its construction expenditures, which was a prerequisite under the program. Coady says he was relieved of this obligation by Toyota but the district court did not credit this claim, and on appeal Coady is silent on this point. Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998).

Finally, under Toyota's allocation regime, its general manager in the region can distribute up to 10% of the cars and 15% of the trucks to dealers at his discretion in order to help dealers meet specific inventory and customer needs. This group of vehicles is not included in the pool subject to the semi-monthly formula periodic allocations. Before 1998 but not after, the percentage limitations on this general manager's pool included any vehicles

-14-

distributed under the market representation vehicle support program.

On appeal Coady argues (again relying upon chapter 93B) that the change in 1998 undermined the semi-monthly formula allocations because there is no limit to the number of vehicles that can be assigned under the Support Program. In principle, a very large number of assignments under the latter program might leave few, if any, for distribution by formula. But the district court found there was no evidence that any such distorting had occurred. Coady offers no answer to this finding, which seems to us preclusive on the principle of "no harm, no foul."

Coady argues that the same deficiencies in allocation already discussed--in particular, Toyota's failure to prevent fraud by other dealers--violated its standard agreement with Coady and so gave rise to contract claims as well as claims under chapter 93B. The standard agreement, in section XIII(B), does require Toyota to use its "best efforts" to provide dealers vehicles required to fulfill the dealer's obligations under the contract and to "endeavor to allocate" vehicles "in a fair and equitable manner, which it shall determine in its sole discretion."

This language is on its face less helpful to Coady than the standard set forth in chapter 93B. "Best efforts" is implicitly qualified by a reasonableness test--it cannot mean everything possible under the sun, see Macksey v. Egan, 633 N.E.2d

408, 413 & n.16 (Mass. App. Ct. 1994)--and the "own discretion" proviso is clearly more qualified than chapter 93B. Coady provides no reason to suppose that allocation system claims that have failed under the statute should prevail under the contract, so no more need be said about this contract-claim perspective.

This brings us to a claim by Coady arising under a different provision of chapter 93B which makes it a violation of section 3 for a distributor to refuse a written request by a dealer to disclose the basis on which the distributor allocates vehicles in Massachusetts and to the dealer in question. Mass. Gen. Laws. ch. 93B, § 4(3)(b) (2001). At trial Coady said that Toyota had failed adequately to respond to Coady's written request for information about how the general manager's pool operated and the number of vehicles.

The district court faulted Coady for not offering evidence of written requests having focused instead on oral requests, but we bypass this issue. This is because the district court also found that even if Toyota had not responded adequately to one written request, no damages had been proved, see note 4 above, and Coady had not requested "any other relief" on this issue. On appeal, Coady complains that the evidence did show a written request but offers no counter to the alternative ground.

Still another subsection of chapter 93B is in issue. Coady claimed and the district court found that Toyota had in some

-16-

cases offered desirable turndowns to dealers on condition that they accept less desirable turndown vehicles as well--a practice that antitrust lawyers would call "tying."  Tying is not automatically unlawful under the antitrust laws (new shoes contain laces), e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 11-12 (1984); Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 17-18 (1st Cir. 1996); but chapter 93B--a catalogue of practices disliked by dealers--includes a precise and seemingly unconditional ban on such tying of vehicles provided to dealers.  Mass. Gen. Laws. ch. 93B, § 4(2)(a) (2001).

On this appeal, Coady does not identify any specific damages linked to such violations but complains that the district court ought to have granted an injunction against continuation of the practice.  The difficulty is that the district court found that Toyota "has not engaged in that practice with Coady since at least 1998"--several years before the trial.  Given the time gap and the absence of any other indication that Toyota would repeat this practice, the denial was within the district court's discretion.[6]

This brings us finally to a set of issues that relate primarily to the renewal of Coady's contract with Toyota and to yet

---

[6]Generally, review of the denial of the injunction is for abuse of discretion.  Aponte v. Calderón, 284 F.3d 184, 191 (1st Cir.), cert. denied, 537 U.S. 886 (2002).  "In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow."  Lemon v. Kurtzman, 411 U.S. 192, 200 (1973); Griffin v. Burns, 570 F.2d 1065, 1079 (1st Cir. 1978).

another provision of chapter 93B. Under section 4(3)(e), it is a violation to cancel or refuse to extend a franchise upon expiration "without good cause" or to offer, "arbitrarily and without good cause," a renewal agreement whose terms "substantially change or modify the sales and service obligations or capital requirements" of the dealer. Mass. Gen. Laws. ch. 93B, § 4(3)(e) (2001). Further, for any such proposed change, 90 days written notice is required including "a detailed statement of the reasons for such action." Mass. Gen. Laws. ch. 93B, § 4(3)(e)(2) (2001).

Coady argued in the district court that the 1999 renewal of the 1993 six-year standard agreement was illegal because it added a requirement of 100 percent retail sales efficiency and reduced the duration to two years but gave written notice only 59 days before the old agreement expired. In 2001, Toyota offered Coady a further two-year renewal, again allegedly on less than 90 days notice, containing the 100 percent retail sales efficiency clause and adding requirements that Coady maintain a 1:1 debt to equity ratio and renovate the interior of its facility.

When Coady complained about the deficient notice period for the 1999 contract, Toyota said it would defer the date of the new agreement (which Coady refused) and Coady never signed the 2001 agreement. Toyota has apparently withdrawn the 1:1 debt to equity ratio and interior renovation demands and not enforced the 100 percent sales efficiency provision. Nevertheless, Coady requested

an injunction pertaining to the renewal dispute and appeals from the district court's failure to provide such relief.

The district court ruled that the shortening of the proposed renewal period from six years to two did not violate the statute because, although this altered the terms, it did not do so in respect of sales and service obligations or capital requirements. Coady may have some answer to this proposition--perhaps unreasonable new terms amount to an arbitrary refusal to renew--but it has not made it nor has it otherwise explained why it is entitled to a longer renewal period.[7] So we put this issue to one side.

As for the inadequate notice period, Toyota corrected the error for the 1999 agreement and ordinarily a district court is not obligated to issue an injunction absent a threat of repetition. This is not because the issue is necessarily moot--mootness may often require more, Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000)--but because injunctions are normally a matter of equity and the court is not required to waste resources where there is no ongoing harm and

---

[7]Coady does cite a case that says that contract length is a material term, Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 832 (Fed. Cl. 2001), hardly a revelation, but nothing in the statute says that every material alteration is covered by the statute. While some material alterations may be unreasonable, the statute makes actionable only those that "substantially change or modify the sales and service obligations or capital requirements". Mass. Gen. Laws. ch. 93B, § 4(3)(e)(2) (2001).

-19-

reasonable threat of recurrence.  <u>Lemon</u> v. <u>Kurtzman</u>, 411 U.S. 192, 200-01 (1973); <u>El Dia, Inc.</u> v. <u>Hernandez Colon</u>, 963 F.2d 488, 498 n.12 (1st Cir. 1992).  Here there is no suggestion of ongoing harm from the unduly short notice period given five years ago.

If Toyota gave inadequate notice again in 2001, the threat of repetition is clearly greater.  But just what occurred as to timing in 2001 is not clear to us, and in any event the proposed changes that would seemingly trigger the need for notice (the 1:1 debt to equity ratio and renovation requirements) were withdrawn by Toyota.  Under the circumstances, the threat of recurrence is not so clear as to require the grant of equitable relief, although Toyota is pressing its luck if it has now made the same short-notice mistake twice.

The most serious renewal claim involves Toyota's apparent continued insistence on the provision requiring 100 percent sales efficiency.  Admittedly, it has not enforced this provision by termination or refusal to renew; and, as the district court found and Coady does not dispute, this negates any obvious damages.  But this does not explain why, <u>if</u> the provision is improper, Coady does not deserve an injunction.  The district court treated the lack of past harm as defeating the injunction as well but this is not necessarily a complete answer.

Even if the provision were not enforced, its presence <u>could</u> hamper Coady's operations and impair its ability to borrow,

(although Coady has not expressly made those claims to us). There is also remedy language in chapter 93B suggesting a lenient standard for injunctions--the statute says the test is whether the violation "<u>may</u> have the effect of causing" a "loss of money or property", Mass. Gen. Laws. ch. 93B, § 12A (2001) (emphasis added) --although we are not now inclined to read this provision as making an injunction mandatory.[8]

Yet the threshold question remains <u>whether</u> the 100 percent sales efficiency provision is improper, and here Coady says only that the notice period was inadequate. Yet there is little risk, if Toyota has any sense at all, that its future demands for such a clause will be pressed on less than 90 days notice. If notice is adequate, then the question under the statute will be whether Toyota has explained its reasons and has a non-arbitrary basis for its request. On these points Coady is completely silent on appeal. Thus, we are unwilling to remand for further proceedings.

Coady is free to sue immediately if Toyota insists on the sales efficiency requirement as a condition of renewal and fails to

---

[8]The provision says that the dealer, even if it has not suffered a loss of money or property, "may" obtain an injunction if the practice "may" cause such a loss. Mass. Gen. Laws. ch. 93B, § 12A (2001). We read the first "may" as licencing an injunction, perhaps even encouraging it, but not as compelling it regardless of circumstances. Coady has not relied on the provision, so our reading is subject to further enlightenment--by means of case law or legislative history--in some future case.

supply the statutory statement of reasons or lacks a non-arbitrary basis for the request.  Our affirmance is without prejudice to such a suit--but also without foreclosing Toyota from showing that its demand is consistent with the statute.  At this point we know nothing about the reasons for the proposed efficiency requirement in a new contract and little about Coady's basis for deeming it arbitrary.

Toyota ought to reflect that it has enjoyed a measure of good fortune in escaping unscathed in this lawsuit.  Its allocation practices vis à vis Coady were no model of perfection and a factfinder who condemned them might well have been upheld.  Further, Toyota has virtually admitted to other violations of chapter 93B (tying, short notice) even if neither damages nor a need for any injunction were proved as to these actions.

The package of new demands ascribed to Toyota (a perhaps unrealistic efficiency condition, the two-year extension, the extra interior-design spending demanded) may or may not be defensible; but they seem less likely to mend a relationship than to foreshadow more litigation under the renewal and termination provisions of chapter 93B.  Perhaps the relationship is now beyond repair, but in the interests of heading off further litigation, both sides may want to consider making a fresh start in negotiating and carrying out a new agreement.

The judgment of the district court is _affirmed_. Reflecting the closeness of the case, each side will bear its own costs on this appeal.

_It is so ordered_.